**John J. HANKY, Jr., et al., Plaintiffs,**

v.

**The CITY OF RICHMOND, Defendant.**

**Civ. A. No. CA81–1115–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Feb. 12, 1982.

James F. Pascal, Hirschler, Fleischer, Weinburg, Cox & Allen, Everette G. Allen, Jr., Debra K. Meyer, Richmond, Va., for plaintiffs.

Ronald R. Wesley, William H. Hefty, Richmond, Va., Harvey M. Applebaum, Virginia G. Watkin, James R. Atwood, Covington & Burling, Washington, D. C., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief for alleged violations by the defendant of the fifth and fourteenth amendments of the Constitution, and for assertedly pendent claims of violation of state antitrust laws and interference with contractual relationships. Plaintiffs originally filed their Bill of Complaint in the Circuit Court of the City of Richmond, Division I on December 28, 1981. The defendant removed the suit to this court on December 31, 1981 under 28 U.S.C. § 1441(a) and (c). Jurisdiction of the Court rests upon 28 U.S.C. § 1331(a).

The matter is before the Court on plaintiffs' motion under Fed.R.Civ.P. 65(a) for a preliminary injunction. For the reasons which follow, the Court concludes that this requested relief must be denied.

**1300**

## I. Facts

Plaintiffs are United States citizens doing business as Canal Square Associates, a general partnership formed under the laws of the Commonwealth of Virginia. Defendant City of Richmond ("City") is a municipal corporation of the Commonwealth of Virginia, organized and existing pursuant to the constitution and laws of that state.

The parties have stipulated that plaintiffs are the fee simple owners of a parcel of real property in the City, designated as Canal Square Parcel A on the plat entitled Lands of the Richmond Metropolitan Authority, 5th & Canal Streets, dated February 16, 1980.[1] This parcel is bounded generally by the Richmond Metropolitan Authority Expressway and Fifth, Seventh and Canal Streets. Plaintiffs allege in their complaint that they acquired an option on September 29, 1981 from the Richmond Metropolitan Authority ("RMA") to purchase two parcels of unimproved real property adjacent to Parcel A, designated Canal Square Parcels B and C on the same plat.[2] These parcels are referred to collectively as the Hilton Hotel Site. Plaintiffs assert that they in turn granted an exclusive option on February 6, 1981 to Richmond Hilton Associates ("RHA"), a Virginia limited partnership, to purchase the site,[3] and that RHA exercised this option on November 27, 1981. Plaintiffs contend that RHA desires and intends to develop a Hilton Hotel on the property, a project in which, say the plaintiffs, it has been actively engaged since September, 1980.

Plaintiffs contend that the City has attempted to thwart the construction of the Hilton Hotel because it allegedly perceives the Hilton as a threat to the viability of its own program for the rejuvenation of downtown Richmond. The City expressed concern over the economic well-being of the downtown area in its 1964 Master Plan which noted a decline in retail sales and in the number of retail establishments, as well as a decrease in the assessed valuation of land and improvements in that section of the City.[4] On November 28, 1977 the City Council approved the Redevelopment Plan for Downtown Redevelopment Project Number One ("Project One Plan"),[5] which called for the redevelopment of a 15.4 acre Project Area bounded by Broad, Fourth, Clay and Seventh Streets in Richmond.[6] Among the objectives of Project One was the provision of land for offices, a hotel and convention center with related parking, retail and entertainment activities.[7] This convention and exhibition center with an adjoining convention hotel had been recommended in a May, 1976 report by the Downtown Development Commission, created by the City in 1974, which further suggested that the multi-use facility be located north of Broad Street in the Sixth Street area, near the City Coliseum at Sixth and Clay Streets.[8] The City intends that the Project One hotel will be developed by private in-

---

1. Exhibit 1 to Plaintiffs' Complaint.

2. The RMA is a corporate entity created under state law for the purposes of financing and constructing limited access highways partially within and partially without the corporate limits of the City. Plaintiffs allege that the RMA is deemed by state law to be the equivalent of, and to have all of the rights of, a municipal corporation

3. Plaintiffs allege that various written amendments to the original option agreement on July 30, September 22, and September 29, 1981 encompassed the entire site.

4. 1964 Master Plan of Land Use, Community Facilities and Trafficways 41, adopted by the City Planning Commission January 18, 1965, approved by the City Council on April 12, 1965 as Resolution No. 65–R27–27. Exhibit A to

Defendant's Memorandum in Opposition to Motion for Preliminary Injunction ("Defendant's Memorandum").

5. Resolution No. 77–R136–133 (November 28, 1977). Exhibit B to Defendant's Memorandum. The Project One Plan itself is attached to Plaintiffs' Complaint as Exhibit 17.

6. Project One Plan, § A.

7. Project One Plan, § A(4).

8. Recommended Plan of Action for Downtown Development, by the Downtown Development Commission (May 1976), summarized in the Report by the Director of Planning and Community Development to the Richmond City Planning Commission ("Planning Director's Report"), at p. 2 (December 1981). Exhibit 3 to Plaintiffs' Complaint.

terests with the encouragement of the City, but without it serving a proprietary role.[9]

Plaintiffs allege that the City has taken various actions to protect its Project One hotel from the development of the Hilton, among them the City Council's enactment of Ordinance No. 81–200 on November 9, 1981, which amended the City's zoning regulations.[10] Before amendment the Code had mandated the filing of a "plan of development", which was required by the Code for all major construction projects in districts zoned RO–1 (residential-office).[11] Such a plan was subject to the approval of the City's Director of Planning and Community Development ("Director of Planning") to ascertain whether the proposed plan was "consistent with the objectives . . ." of the 1964 Master Plan. Ordinance No. 81–200 imposed the further requirement that the Planning Director must also determine, in order to approve the plan, that it is

consistent . . . with the objectives of the Redevelopment Plan for Downtown Redevelopment Project One, and that the approval thereof will not impede or delay the attainment of the objectives of such redevelopment plan. . . .

The Planning Director's decision is reviewable by the Planning Commission.

Pursuant to Ordinance 81–200, the City's Director of Planning reviewed and disapproved of the plan of development for the proposed Hilton on November 25, 1981. The Planning Commission upheld this decision after hearings on December 14 and 22. Plaintiffs now argue that the ordinance is void for vagueness, outside the scope of the City's police power, and amounts to a taking without just compensation and is thereby unconstitutional. They seek a preliminary injunction ridding themselves of its effect and vitiating the Planning Director's disapproval of the Hilton development pending the outcome of this litigation.

## II. *The Injunctive Relief Inquiry*

The standard for determining whether preliminary injunctive relief should issue is the balance-of-hardship test of *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189 (4th Cir. 1977). *See Maryland Undercoating Co., Inc. v. Payne,* 603 F.2d 477 (4th Cir. 1979). This test involves the "flexible interplay" of these factors:

(1) likelihood of irreparable harm to the plaintiffs without an injunction;

(2) likelihood of harm to the defendant with an injunction;

(3) plaintiffs' likelihood of success on the merits;

(4) the public interest.

The first step of the Court's analysis requires a balancing of the likelihood of irreparable harm to the plaintiffs without an injunction against the likelihood of harm to the defendant with an injunction. If a "decided imbalance of hardship should appear in plaintiffs' favor, it is enough that grave or serious questions are presented, . . ." and plaintiffs do not have to show a likelihood of success on the merits. These are the two most important factors, and the need for plaintiffs to show likelihood of success on the merits increases as the probability of irreparable injury to plaintiffs without an injunction decreases. Also, if the plaintiffs have a strong probability of success on the merits, even a "possible" irreparable injury will suffice to warrant injunctive relief. *Blackwelder, supra,* at 195; *Maryland Undercoating, supra,* at 481.

### A. *The Balance of Hardships:*

■ In their motion for a preliminary injunction, plaintiffs sought to enjoin the City from "taking any action (including, without limitation, giving any effect to Ordinance No. 81–200 or any actions taken pursuant thereto . . .) to prevent, hinder or

---

**9.** Plaintiffs' Complaint, ¶ 13; Defendant's Memorandum, p. 6.

**10.** Richmond City Code, ch. 32.1 (1975). The amendments were to §§ 32.1–1030.1, 32.1–1030.3 and 32.1–1030.4 of the City Code.

**11.** The relevant portions of downtown Richmond are so zoned.

delay ..." the plaintiffs from developing their property for hotel purposes on the grounds that such development "would, or could, or might have any impact or consequence of any kind ..." on the development of the Project One hotel. At oral argument, however, plaintiffs' counsel narrowed the expansive scope of this requested relief by indicating that plaintiffs desire principally to "be free of the ordinance", *i.e.*, to restore the parties to the situation which existed before it was passed, which would allow the plaintiffs and RHA to proceed with the Hilton development, or any other use for the plaintiffs' land, without the impediment of the Planning Director's disapproval or possible disapproval.

Determination of whether plaintiffs face irreparable harm without an injunction requires examination of the quantum and quality of their likely harm relative to the detriment to the City should an injunction issue. *Blackwelder, supra*, at 196. Irreparability of harm includes the "impossibility of ascertaining with any accuracy the extent of the loss." *Id.* at 197.

Neither party to this suit has submitted any concrete evidence of the injury it will face with or without an injunction. Plaintiffs present no testimony, affidavits or other specific materials to substantiate their claim that they will suffer irreparable injury in the absence of an injunction. At hearing, plaintiffs' counsel argued that Ordinance No. 81–200 suffers from unconstitutional vagueness since it fails to provide adequate standards to guide the Planning Director's decision on proposed construction projects and thereby fails adequately to inform plaintiffs of the uses they could make of their property. This uncertainty over

permissible uses of the land, plaintiffs say, renders measurement of the value of their property impossible, and inflicts on them the injury of holding property the value of which cannot be determined. In addition to whatever injury inherently exists in such a situation, plaintiffs contend that this uncertainty may be deterring potential investors, who would otherwise be interested, from attempting to purchase the property from them.

The Court is of the view that these claims of injury deserve little weight, relative to the harm to the City if an injunction were granted. Whatever intangible injury caused plaintiffs by their inability to know the value of their property is purely speculative and plaintiffs have not suggested under what theory or set of circumstances damages for such injury would ever be recoverable. Similarly, whether or not there exist potential investors deterred from coming forward because of the alleged uncertainty over permissible uses of the property is a speculative question. Plaintiffs are, as they aver in their complaint,[12] contractually obligated to sell the lot to an actual investor under a contract[13] which specifies a contract price and liquidated damages in the event certain conditions precedent are not fulfilled and settlement does not occur. This obligation would seem to provide plaintiffs with an adequate remedy at law by providing a means to calculate damages for the loss of an actual, willing investor because of Ordinance No. 81–200, should such loss occur.[14]

The injunction plaintiffs seek would allow them to proceed with the Hilton Hotel development without the absolute impediment currently imposed by the Planning

---

12. Complaint, ¶ 8.

13. Exhibit 3 to Plaintiffs' Complaint.

14. *Henry v. Greenville Airport Commission*, 284 F.2d 631 (4th Cir. 1960), relied on by plaintiffs, may be distinguished. There, plaintiffs, who were black, had clearly shown that the defendant airport maintained separate waiting rooms for blacks and whites. The court ruled that a preliminary injunction must be granted "to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right." *Id.* at 633. Plaintiffs claim that their constitutional right to due process is being violated by alleged vagueness of Ordinance No. 81–200, but they have not clearly established this by undisputed evidence, as indicated in the text which follows.

Director's disapproval, and without the necessity of justifying the Hilton's compatibility with Project One to any agency of the City. The City claims it will be caused great injury if the Hilton project is allowed to commence.

The City adopted the Project One Plan after determination that the area involved is "blighted and deteriorated and ... detrimental to the safety and welfare of the community ..." because of building conditions, environmental deficiencies, obsolete structures, inadequate alleys and inadequate original subdivision, which impaired economic values and tax revenues in the area and exerted an adverse influence on surrounding areas.[15] The May, 1976 report of the Downtown Development Commission[16] reflected on the general malaise in downtown Richmond, especially of the retail core and the area north of Broad Street, and identified as objectives for downtown the strengthening of its economic base, enhancement of cultural and recreational opportunities, attracting more people to the area, and provision of appropriate transportation and parking. This report also recommended the development of a convention and exhibition center and convention hotel as a primary means to achieve this revitalization. The City has recently reaffirmed its determination that the success of the Project One Plan is essential to the strengthening of the retail core of the City and the area north of Broad Street.[17] The City has committed $17,000,000 for construction of a municipal convention center and for other public improvements in the Project One area.[18]

To support its assertion that it will be injured if the Court issues the injunction plaintiffs request, the City relies on documents recounting the above history of Project One and upon the Planning Director's Report.[19] Arguing that the success of the Project One hotel is crucial to the success of Project One as a whole, the City contends that commencement of the Hilton Hotel will threaten the viability of the Project One facility, which has yet to locate its own private investor.

The Planning Director's Report recounts the City's position that the convention center should not be built without the Project One hotel because private investment should be concomitant to public investment, no other existing hotels or proposed hotel sites could effectively service the convention center, and no other hotel or hotel site could as effectively stimulate the retail core. Relying on five studies of the downtown hotel market and information from a consultant company and the Marriott Corporation, the Planning Director concluded that the start of construction of a new hotel, other than the Project One hotel, would have these consequences:

(1) it is unlikely that the Project One hotel could begin construction for approximately five years, because the Richmond market, while positive, is not strong enough to entice either a hotel operator or an investor to commit to a second hotel;

(2) since no other existing hotel or proposed hotel site can adequately serve the Convention Center, the Convention Center will not be built for approximately five years. In five years, if there is still a retail core to save, and hence a purpose for Project One, the cost of building a competitive Convention Center will have risen at least 50% because of inflation;

(3) without the activity generator that Project One will be, especially the hotel

---

**15.** Resolution No. 77–R136–133 (November 28, 1977). Exhibit B to Defendant's Memorandum.

**16.** Summarized at pp. 2–3 of the Planning Director's Report, Exhibit 17 to Plaintiffs' Complaint.

**17.** Resolution No. 81–R132–125 (November 9, 1981), Exhibit 12 to Plaintiffs' Complaint.

**18.** Ordinance No. 77–247–219 (November 28, 1977), as amended by Ordinance No. 80–228–192 (November 17, 1980).

**19.** Exhibit 17 to Plaintiffs' Complaint.

and Convention Center, we can expect a continued, perhaps fatal, erosion of our retail core;

(4) without Project One, there will be no economic impetus to North Core development, which, coupled with the loss of our major retail base, will have a significant impact on our whole downtown economic base.

Plaintiffs have presented no evidence to refute these conclusions. The Court must conclude, then, that the granting of preliminary relief will present substantial risks to the City and some injury, the probability of which has not been disputed. Thus, there is no imbalance of hardship in plaintiffs' favor. Rather, plaintiffs have shown little probability of irreparable injury, which diminishes further in significance relative to the cost to the City should an injunction issue. In such circumstances, there is an increased need for plaintiffs to show likelihood of success on the merits.

B. *Likelihood of Success on the Merits*:

Plaintiffs contend that Ordinance No. 81–200:

(1) is unconstitutionally vague because it fails to provide any standards by which the Planning Director is to determine whether a proposed development "will impede or delay the attainment of the objectives . . ." of the Project One Plan;

(2) is outside the scope of the City's police power since it is designed to prevent competition among private investors and not to safeguard the health, safety or public welfare of its citizens;

(3) constitutes a denial of due process in the form of a taking of private property without just compensation.

1. *Police Power: Taking without Compensation*:

The Court addresses first the latter two questions, for they dissolve in part into one

inquiry. If the ordinance and the Planning Director's decision thereunder are valid exercises of the municipality's police power, then there is no unconstitutional taking, in general terms. Thus, one aspect of the due process analysis as well as the police power question turn on whether the ordinance substantially advances legitimate state interests, *e.g.*, the health, safety, morals or general welfare. *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 125, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

Plaintiffs claim that Ordinance No. 81–200 denies them certain uses of their property in violation of the fifth amendment prohibition of the taking of property for public use without providing "just compensation." [20] This fifth amendment guarantee is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central, supra*, at 123, 98 S.Ct. at 2658, quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). This is a difficult inquiry, with no set formula to determine when economic injuries caused by public action should be spread over all the community, rather than remain disproportionately concentrated on a few persons. *Penn Central, supra*, 438 U.S. at 124, 98 S.Ct. at 2659. Zoning regulations imposing land-use regulations that destroy or adversely affect recognized real property interests present a less obvious taking problem than does, for example, physical invasion of property by the government, for the burden of such a regulation normally has a broader incidence and affects a broad cross section of people who are able to protect their own interests through the representative political process. Nonetheless, a zoning ordinance such as the one involved herein must withstand a minimum level of judicial scrutiny. As the Court stated in *Agins, supra*, a zoning law effects a taking

---

20. This fifth amendment provision is made applicable to the states through the fourteenth amendment. *Chicago, B. & Q. R. Co. v. Chica-* *go*, 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897).

(1) if the ordinance does not substantially advance legitimate state interests; or (2) if the ordinance denies an owner economically viable use of his land.

This analysis necessitates a weighing of private and public interests. *Id.* 447 U.S. at 260, 100 S.Ct. at 2141. In the instant action, plaintiffs attack the facial validity of Ordinance No. 81–200 and its requirement that construction projects be reviewed by the Planning Director to determine whether they are consistent with the objectives of the Project One Plan and will not impede or delay the attainment of its objectives. As such, plaintiffs challenge the mere enactment of the amendment to the original zoning law. Plaintiffs also complain of the Planning Director's disapproval of their proposed construction of a Hilton Hotel and thereby challenge the ordinance as it has been applied to their specific parcel to deny them a particular use of that parcel. In evaluating plaintiffs' likelihood of success on either their facial challenge or attack on the ordinance as applied, the Court deems it appropriate, *infra,* to apply both prongs of the *Agins* standard.

(a) *Challenge to the Ordinance on its Face* :

The initial prong of the *Agins* analysis derives from *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926), wherein the Court ruled that a zoning ordinance is unconstitutional if it is "clearly arbitrary and unreasonable, . . ." and has "no substantial relation to the public health, safety, morals or general welfare." [21] *See Clark v. City of Los Angeles,* 650 F.2d 1033 (9th Cir. 1981) (zoning regulations requiring permits to sell used merchandise on private property and prohibiting open-air sales of such merchandise upheld); *Maher v. City of New Orleans,* 516 F.2d 1051 (5th Cir. 1975) *cert. denied,* 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976) (ordinance passed to regulate the preservation and maintenance of buildings in the historic French Quarter of New Orleans and requiring a permit from a commission before construction on, or alteration of, buildings in that area upheld as proper exercise of the police power).

States and localities enjoy much discretion in determining specific objectives of exercises of their police power. [22] Protecting residents from the "ill effects of urbanization . . ." is a permissible goal, *Agins, supra* 447 U.S. at 261, 100 S.Ct. at 2141, as is the preservation of residential areas to the exclusion of industrialization. *Euclid, supra.* "The concept of the public welfare is broad and inclusive. . . . The values it

---

**21.** This rational relationship or "substantial advancement" aspect of the taking analysis is very similar to the modern rational relationship test used in equal protection challenges to distinctions made in economic legislation not involving any suspect classification. *See Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979) (statute will not be overturned "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational"). It also strongly resembles the rational relationship for determining whether a law comports with substantive due process principles under cases such as *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955), which rejected the judicial exercise of legislative power implicit in the older *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), approach. *See Rogin v. Bensalem Township,* 616 F.2d 680 (3d Cir. 1980) *cert.*

*denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981).

**22.** The Virginia rule on judicial review of zoning ordinances was stated in *Board of Supervisors of Fairfax County v. Snell Construction Corp.,* 214 Va. 655, 202 S.E.2d 889, 892–93 (1974) as:

The legislative branch of a local government in the exercise of its police power has wide discretion in the enactment and amendment of zoning ordinances. Its action is presumed to be valid so long as it is not unreasonable and arbitrary. The burden of proof is on him who assails it to prove that it is clearly unreasonable, arbitrary or capricious, and that it bears no reasonable or substantial relation to the public health, safety, morals, or general welfare. The court will not substitute its judgment for that of a legislative body, and if the reasonableness of a zoning ordinance is fairly debatable it must be sustained.

represents are spiritual as well as physical, aesthetic as well as monetary." *Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954) (elimination of substandard housing conditions). Preservation of "family values, youth values and the blessings of quiet seclusion and clear air . . ." is also within the police power. *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (ordinance restricting land use to one-family dwellings held valid). The Court in *Goldblatt v. Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), upheld on safety grounds an ordinance prohibiting dredging and pit excavation below the water table and requiring that existing excavation below that level be refilled. Safeguarding the scenic environment was seen as a proper goal in *Clark v. City of Los Angeles, supra.*

■ The issue herein is whether the City's enactment of an ordinance requiring review of construction projects by the Plan-

ning Director to evaluate their compatibility with the objectives [23] of the Project One Plan was directed toward a goal involving the health, safety, morals or general welfare of its residents. The Virginia legislature has delegated the zoning power to counties and municipalities. Va.Code § 15.-1–486. Zoning ordinances are, under state law, to be designed to, *inter alia*, reduce or prevent congestion in public streets, facilitate the development of a "convenient, attractive and harmonious community," prevent overcrowding and undue density of population, and "encourage economic development activities that provide desirable employment and enlarge the tax base." Va. Code § 15.1–489. The City adopted Ordinance No. 81–200 in a resolution which affirmed the Project One objectives of revitalizing the downtown area of the City in order to strengthen its economic base, enhance cultural and recreational opportunities, provide employment, attract more people to the area, and provide transportation

---

**23.** The objectives of the Project One Plan are to:

1. Acquire and remove structurally substandard and obsolete buildings in the Project Area detrimental to the safety and welfare of the Community, including those buildings exhibiting blighting influences which tend to cause physical and environmental deterioration.

2. Acquire property where the conditions of title, diverse ownership of the property to be assembled, lot layouts or other conditions prevent a proper development of the property and where such acquisition is necessary to carry out this Redevelopment Plan.

3. Encourage owners of existing properties not to be acquired to extend the useful life of such structures in the Project Area, which are compatible with proposed land uses, to improve the surrounding environment, and to replace through new construction deteriorated or obsolete buildings within the Project Area.

4. Provide land for public and private development of uses which will support and strengthen the functions of downtown particularly the Retail Core (bounded by Fourth, Ninth, Franklin and Broad Streets) and the North Core (bounded by Interstate 95 and Fourth, Ninth and Broad Streets). Such uses include offices, a hotel and convention center and related parking, retail and entertainment activities.

5. Broaden Richmond's convention-serving potential through development of a new hotel and convention/exhibit facility relating to the existing Coliseum directly north of the Project Area.

6. Strengthen the tax base of the City through new development in the Project Area suitable to downtown that will replace deteriorated buildings.

7. Provide pedestrian linkages within the Project Area and facilitate development of a Sixth Street pedestrian mall extending from the Project Area through the Retail Core.

8. Provide a strong visual image for the Project Area internally and along Broad Street through building facade, open space, and landscape treatment of consistently high quality.

9. Relocate existing businesses, where necessary, in close cooperation with affected merchants and offer relocation opportunities, where desired and available within affordable limits, in or near the Project Area.

10. Provide public improvements to complement and serve new development, including needed utilities, street and alley closings, landscaping, pedestrian facilities and parking.

Project One Plan, at 2–3. Exhibit 2 to Plaintiffs' Memorandum.

and parking. It imposed the Planning Director review requirement on new construction projects in the City since it saw such review as "important to the success of . . ." the Project One Plan.[24] It seems that the economic, aesthetic and cultural objectives of the Project One Plan and in turn of Ordinance No. 81–200 are within the scope of the municipality's police power.

■ The next issue is whether the requirement of review by the Planning Director of redevelopment plans for construction projects is rationally related to or substantially advances those objectives. The Court concludes, for the purposes of the matter before it, that scrutiny of proposed projects to ensure they will not impede attainment of the objectives of the Project One Plan will substantially advance progress towards the goals the City has set for its revitalization program. On its face, a rational way to advance this progress is to review projects for their compatibility with Project One.

■ Of course, enactment of the Ordinance was beyond the scope of the City's police power if it was done unreasonably or arbitrarily. Plaintiffs appear to complain that the ordinance was prompted by their proposed development, and that its mere enactment was directed at them in a discriminatory, arbitrary fashion. The ordinance is presumptively reasonable, and "debatable questions as to reasonableness are not for the courts but for the legislature . . ." *Goldblatt v. Hempstead, supra,* 369 U.S. at 595, 82 S.Ct. at 990. A land use decision, however, which arbitrarily singles out a particular parcel for different, less favorable treatment than neighboring ones is not a proper exercise of the police power. *Penn Central, supra* 438 U.S. at 132, 98 S.Ct. at 2663. The *Penn Central* Court rejected the argument that a city ordinance providing for the designation of historic landmarks and restrictions on the development of such sites had placed the burden solely on the plaintiffs, owners of the historic Grand Central Terminal, for the law applied to many structures in the city. Similarly, Ordinance No. 81–200 applies to all major construction projects in districts zoned RO–1, and not just to the plaintiffs. Regulation or legislation designed to promote the general welfare commonly burdens some more than others. *Penn Central, supra* at 133, 98 S.Ct. at 2663. The plaintiffs in *Goldblatt* operated a sand and gravel excavation mine on their property. The town within which this property was located enacted an ordinance prohibiting any excavation below the water table and requiring that such pits be refilled, which completely prevented plaintiffs' use of their property for mining. Nonetheless, the Court upheld the ordinance as a valid exercise of the police power. Along the same line is *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), where the Court upheld a law prohibiting the plaintiff from continuing his business of operating a brickyard. Thus, although the plaintiffs may be able on a complete record to show that the enactment of the ordinance was arbitrarily directed at them alone, they have provided nothing to suggest that they possess a strong likelihood of prevailing on this point.

The second prong of the *Agins* standard provides that a regulation will be seen as taking if it denies an owner economically viable use of his land. *Id.* 447 U.S. at 260, 100 S.Ct. at 2141. A governmental action may be "so onerous as to constitute a taking . . .," *Goldblatt, supra,* 369 U.S. at 594, 82 S.Ct. at 990, where the "interference with [the plaintiffs'] property is of such a magnitude that 'there must be an exercise of eminent domain and compensation to sustain it.'" *Penn Central, supra,* 438 U.S. at 136, 98 S.Ct. at 2665. The *Goldblatt* Court, stating that there is "no set formula to determine where regulation ends and taking begins," ruled that a comparison of values before and after is relevant, but not

**24.** Resolution No. 81–R132–125 (November 9, 1981), Exhibit 12 to Plaintiffs' Complaint.

conclusive. 369 U.S. at 594, 82 S.Ct. at 990. The Court went on to conclude that the ordinance in question had not reduced the value of the plaintiffs' gravel pit lot. It must kept in mind that diminution of value alone will not establish a taking. *Euclid, supra* (75% diminution in value); *Hadacheck, supra* (87½% diminution). *See Penn Central, supra,* 438 U.S. at 131, 98 S.Ct. at 2662. Plaintiffs have not provided any indication of the extent to which, if any, the mere requirement of review by the Planning Director has diminished the value of their property, and it seems unlikely that they will be able to show that such a requirement has denied them economically viable use of their land.

(b) *The Ordinance as Applied* :

The plaintiffs have submitted their proposed hotel project to the Planning Director for review, and he has disapproved of it as inconsistent with the Project One hotel. This decision was affirmed by the Planning Commission. Thus, unlike the situation in *Agins,* this action presents a "concrete controversy" regarding the application of Ordinance No. 81–200 to the plaintiffs which must also pass muster under the taking analysis.

Under the first aspect of the *Agins* inquiry, this decision will be seen as confiscatory if it fails substantially to advance legitimate police power objectives of Project One, or if it is unreasonable or arbitrary. Plaintiffs have not contested the conclusion of the Planning Director that the development of the Hilton would threaten the success of Project One, so it appears at this stage of the proceedings that his decision will substantially advance that development. Plaintiffs' primary argument here is that the Planning Director applied the ordinance to disapprove of their hotel in order to protect the Project One hotel from competition and award a monopoly to the private investor who will operate the City's hotel. This, they contend, is not a legitimate state interest, relying on two Virginia cases. In *National Linen Service Corp. v. City of Norfolk,* 196 Va. 277, 83 S.E.2d 401 (1954), the court invalidated an ordinance which prohibited the use of cloth towels in food establishments and required instead the provision of paper towels. The court stated, as a general rule, that ordinances which "necessarily restrain competition and tend to create monopolies or confer exclusive privileges are generally condemned." 83 S.E.2d at 404. Secondly, in *Board of County Supervisors of Fairfax County v. Davis,* 200 Va. 316, 106 S.E.2d 152 (1958), the county refused to grant plaintiffs' application for rezoning of an area to permit them to build a shopping center, primarily to prevent competition to a shopping center it had approved earlier. Again, the court stated a general rule that restriction of competition is not a proper function of a zoning regulation.

From the Planning Director's report, it appears that the primary ground for disapproval of the Hilton was the competitive threat it would present to the Project One hotel, and plaintiffs, in the Court's view, show some likelihood of success on this issue. This probability, however, is not as unequivocal as plaintiffs contend. Both *National Linen* and *Davis* involved zoning decisions designed to protect one purely private business from another, and no public interest was involved. The *Davis* court quoted approvingly a consultant's opinion who felt that economic effects of a permit request could be considered only at "the point at which [they] reach into the general welfare . . ." and indicated that the county had disapproved of the second shopping center not because of any concern for the public interest but solely because a prior commitment had been made to the first private investor. It is the City's position that the anticompetitive concern here arose out of a perceived need to protect the success of a public interest project. Also, in *National Linen,* the court's decision seems to have turned primarily on its conclusion that the ordinance's distinction between paper and cloth towels was arbitrary, since

paper towels were no more sanitary or convenient than those made of cloth.

Plaintiffs will ultimately prevail if they can show that the Planning Director's decision was arbitrary or discriminatorily singled them out for unfavorable treatment. *Penn Central, supra,* 438 U.S. at 132, 98 S.Ct. at 2663. *See Nectow v. Cambridge,* 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928) (decision under zoning law which placed a portion of plaintiff's land in a residential district, while those surrounding it were zoned for industrial uses held invalid). *Cf. Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (state entomologist acting under a state statute ordered plaintiffs to destroy their ornamental red cedar trees because they produced a rust fatal to nearby apple trees; Court held that the failure of the statute to provide compensation for the value of the felled trees or for the resulting decrease in market value of the property did not render it invalid, since a state can decide to destroy one class of property "in order to save another which, in the judgment of the legislature, is of greater value to the public." *Id.* 438 U.S. at 126, 98 S.Ct. at 2660). Plaintiffs have not yet suggested that other proposed hotels or similar concerns have been approved while theirs was not, but they do possess some possibility of success on this issue.

Plaintiffs would also prevail on the second *Agins* prong if the denial of the use of their property as a Hilton Hotel has deprived them of economically viable use of their land. Plaintiffs assert that the decision has decreased the value of the lot, but have yet to show its value for other purposes or to address the question of what other uses are available for the lot. The Planning Director's decision does not address other uses of the land and does not preclude all construction on the site. *See Penn Central, supra,* 438 U.S. at 136–38, 98 S.Ct. at 2665–2666. In short, plaintiffs have made no showing of any strong likelihood of success on this issue.

**25.** The objectives of the Project One Plan are

2. *Due Process: Vagueness:*

Plaintiffs contend that the requirement in Ordinance No. 81–200 that proposals be reviewed by the Director to determine if they are "consistent . . . with the objectives of . . ." Project One and whether its approval will "impede or delay the attainment of the objectives . . ." of Project One [25] is impermissibly vague in that it lacks any standards or factors to guide the Director's inquiry and leaves an owner uncertain as to what uses his property may be put. More specifically, plaintiffs argue that the meanings of "consistent," "impede or delay" and "attainment of the objectives" are unclear and that certain of the listed objectives of the Project One Plan are overly general and vague.

The due process doctrine of vagueness rests on two policies:

(1) provision of fair notice and warning to those affected of the meaning of statutes or rules;

(2) requiring legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement of a statute or rule.

*Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 1246–1247, 39 L.Ed.2d 605 (1974).

The policy of provision of fair notice and warning applies most acutely where the consequences of an erroneous interpretation of a law are severe. Criminal statutes are an archetypal illustration of the application of the doctrine, which requires that

[t]he crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue.

*Connally v. General Construction Co.,* 269 U.S. 385, 393, 46 S.Ct. 126, 128, 70 L.Ed. 322 (1926) (statute requiring contractors to pay their employees "not less than the current rate of per diem wages in the locality where the work is performed" and imposing penal-

enumerated in note 23, *supra.*

ties for violations held impermissibly vague). The *Connally* Court set up the rule that

a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.

*Id.* at 391, 46 S.Ct. at 127. *See also United States v. Powell*, 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975) (criminal statute which proscribed mailing pistols, revolvers and "other firearms capable of being concealed on the person" upheld over a vagueness challenge; Court ruled that the fact that the legislature might have chosen clearer and more precise language to achieve its end did not make the law unconstitutionally vague); *United States v. National Products Dairy Corp.*, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) (Court held that § 3 of the Robinson-Patman Act, 15 U.S.C. § 13a, which made it a crime to sell goods at "unreasonably low prices for the purpose of destroying competition or eliminating a competitor" was not unconstitutionally vague as applied to sales below cost for the purpose of destroying competition).

Deportation is another grave consequence which justifies scrutiny of a law under the vagueness doctrine. In *Jordan v. De George*, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951), a federal statute required deportation of any alien sentenced more than once to imprisonment for one year or more because of conviction for a "crime involving moral turpitude." The Court held that this language provided sufficient warning of the types of crimes included, stating that the vagueness test is "whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices," and that "[i]mpossible standards of specificity are not required." *Id.* at 231–32, 71 S.Ct. at 707–708.

The vagueness doctrine has also been applied to statutes or ordinances which touch upon the first amendment freedoms of speech and press. The doctrine demands a greater degree of specificity here than in cases dealing with purely economic regulation, for the inability to determine the meaning of the law inhibits or chills the exercise of those freedoms by causing citizens to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). *See Smith v. Goguen, supra*, 415 U.S. at 573, 573 n.10, 94 S.Ct. at 1247. In *Grayned*, the Court found no unconstitutional vagueness in an antinoise ordinance which prohibited "the making of noise or diversion which disturbs or tends to disturb the peace or good order ..." while on grounds "adjacent to" a school. The *Goguen* Court struck down a state flag-misuse statute which imposed criminal liability on anyone who "treat[ed] contemptuously" the United States flag in part because it failed to "draw reasonably clear lines between the kinds of nonceremonial treatment that are criminal and those that are not." 415 U.S. at 574, 94 S.Ct. at 1247.

The ordinance involved herein imposes no criminal liability, and does not trench upon any first amendment freedoms. Nor does the consequence to an owner planning for a particular use for his property only to find later that the proposed use is inconsistent with Project One objectives seem to carry as grave severity as the imposition of criminal penalties or deportation. Nonetheless, the vagueness doctrine may still apply to Ordinance No. 81–200. In *United States Civil Service Com. v. National Ass'n. of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Court addressed the validity of § 9(a) of the Hatch Act, 5 U.S.C. § 7324(a)(2), which prohibited federal employees from taking "an active part in political management or in political campaigns" and the alleged vagueness of regulations promulgated under the Act by the Civil Service Commission to describe the types of conduct it prohibited or permit-

ted.[26] Although the Court found some uncertainty about the meaning of taking an "active part in managing," "actively participating in . . . fundraising" or becoming a "partisan" candidate for office, the Court upheld the regulations since they were

> set out in terms that the ordinary person exercising common sense can sufficiently understand and comply with, without sacrifice to the public interest.

413 U.S. 579, 93 S.Ct. at 2897. Although *Letter Carriers* involved significant first amendment issues, this formulation of the notice standard lends itself to application in other contexts. Plaintiffs may ultimately be able to show that the doctrine applies in the instant case but this uncertainty undercuts the likelihood of their success. Furthermore, it is not clear to the Court at this point that "consistent", "impede or delay" and "attainment," along with the stated objectives of Project One, are so vague that the ordinary person exercising common sense can not sufficiently understand them. Plaintiffs show some likelihood of prevailing on this issue, but have not persuaded the Court that this probability is strong enough to ignore the other aspects of the *Blackwelder* inquiry.

The second major policy behind the vagueness doctrine favors its applicability here. In the words of the Court in *Grayned,*

> if arbitrary and discriminating enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

408 U.S. at 109, 92 S.Ct. at 2299. This policy applies with special force in cases such as *Grayned* involving statutes or ordinances which restrict first amendment rights, for language with a standardless sweep allows those who administer or enforce it to "pursue their personal predilections." *Smith v. Goguen, supra,* 415 U.S. at 575, 94 S.Ct. at 1248. Again, plaintiffs show some possibility of success on this contention, but have not shown that this is a strong probability. The reference in Ordinance No. 81–200 to the listed objectives of the Project One Plan may provide sufficient parameters for the Planning Director's decision. Furthermore, the Court in *Penn Central* rejected the argument that New York's law which allowed a commission to designate a structure as a "landmark" was inevitably arbitrary or subjective, ruling that

> there is no basis whatsoever for a conclusion that courts will have any greater difficulty identifying arbitrary or discriminatory action in the context of landmark regulation than in the context of classic zoning or indeed in any other context.

438 U.S. at 133, 98 S.Ct. at 2663.

### C. *The Public Interest* :

The Court must conclude that the public interest lies with the City in this instance, for plaintiffs seek to restrain the enforcement of an ordinance passed by the municipality's governing body and deemed by it to be in the public interest. Even though this ordinance may be later determined to be invalid, it was presumptively designed to further the public good. *See Blackwelder, supra,* 550 F.2d at 197; *West Virginia Highlands Conservancy v. Island Creek Coal Co.,* 441 F.2d 232, 236 (4th Cir. 1971).

### III. *Conclusion*

The Court thus concludes that the balance of hardships favors the City, plaintiffs have not shown a strong probability of success on the merits and the public interest factor rests with the City. Mindful that mandatory preliminary injunctions normally should be granted only in those circum-

**26.** 5 CFR pt. 733.

stances when the exigencies of the situation demand such relief, *Wetzel v. Edwards*, 635 F.2d 283 (4th Cir. 1980), the Court holds that plaintiffs' motion for a preliminary injunction is denied.

An appropriate order will issue.