926 F.2d 353
 136 L.R.R.M. (BNA) 2649, 59 USLW 2551,
118 Lab.Cas. P 10,628
 RUM CREEK COAL SALES, INCORPORATED, Plaintiff-Appellant,
v.
Honorable W. Gaston CAPERTON; Colonel J.R. Buckalew;
Captain A.W. (Gene) Bumgardner; Sergeant Glen A. Ables;
Sergeant David L. Belcher; Sergeant B.R. Chafin; Sergeant
P.D. Clemons; Corporal W.E. McGraw, II; Trooper C.E.
Akers; Trooper K.W. Cordial; Trooper W.R. Gibson; Trooper
C.P. Miller; Trooper J.B. Schoolcraft; Trooper B.A. Sloan;
Trooper Gary R. Tincher, and other officers of the West
Virginia State Police whose identity is presently unknown to
Plaintiff, Defendants-Appellees.
 No. 90-1439.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 31, 1990.
Decided Feb. 25, 1991.
As Amended May 6, 1991.
 
 Paul M. Thompson (argued), Gregory B. Robertson, James P. Naughton, Todd A. Leeson (on brief), Hunton & Williams, Richmond, Va., Forrest H. Roles, Mark A. Carter, Smith, Heenan & Althen, Charleston, W.Va., for plaintiff-appellant.
 Jan L. Fox, Deputy Atty. Gen. (argued), Roger W. Tompkins, Atty. Gen., Bruce Ray Walker, Deputy Atty. Gen. (on brief), Charleston, W.Va., Teresa L. Sage, Asst. Atty. Gen., South Charleston, W.Va., for defendants-appellees.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 MURNAGHAN, Circuit Judge:
 
 
 1
 In the late summer of 1989, Rum Creek Coal Sales (the "Company") became involved in a coal strike. The appeal before us does not focus on the conduct of strikers or the coal company; rather, we are asked to examine the actions of the West Virginia Police ("Police").[1] As the coal strike progressed, the Company became convinced that the Police were failing to protect it because of the Police's construction of two West Virginia statutes. The Company sought a declaratory order that the two state statutes were unconstitutional and a permanent injunction preventing the Police from enforcing or, in effect, relying on the statutes. One statute prohibits the Police from aiding either party to a labor dispute through actions beyond those required to enforce the laws. The other statute, which normally establishes liability for criminal trespass, ceases to apply in a labor dispute. The Company sought a preliminary injunction. Although the district court judge found that, as a result of Police reliance on the statutes, the Company had suffered irreparable harm and that the Police's actions had been ineffective to prevent breach of the law, he denied the motion. The Company appeals the denial of the preliminary injunction. Under the standard established by Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir.1977), we reverse the denial of the preliminary injunction and remand to permit the district court judge to reconsider the motion for a preliminary injunction in accordance with this opinion. As explained in detail below, we only consider whether the criminal trespass statute supports the granting of a preliminary injunction. We do not believe that sufficient evidence has been revealed in the record to permit us to reach a decision about the statute prohibiting extralegal aid, and thus we leave any such decision to the district court's discretion. Moreover, our analysis regarding the preliminary injunction does not, of course, foreclose subsequent arguments as the case develops over the merits of the underlying issues.
 
 I. The West Virginia Statutes
 
 2
 Two statutes create the controversy. First, the "Neutrality Statute" states:
 
 
 3
 No officer or member of the department of public safety may, in any labor trouble or dispute between employer and employee, aid or assist either party thereto, but shall in such cases see that the statutes and laws of this State are enforced in a legal way and manner.
 
 
 4
 W.Va.Code Sec. 15-2-13. Second, the "Trespass Statute" ("Trespass on property other than structure or conveyance") makes a trespasser criminally liable for knowingly entering property without permission and contrary to notice, defying an order to leave, causing damage while trespassing, or being armed with a weapon and intending to cause bodily harm while trespassing. The penalties range from a fine of less than one hundred dollars to six months in prison. The last provision of the statute, however, contains a proviso:
 
 
 5
 (d) Notwithstanding and in addition to any other penalties provided by law, any person who performs or causes damage to property in the course of a willful trespass shall be liable to the property owner in the amount of twice the amount of such damage: Provided that the provisions of this article shall not apply in a labor dispute.
 
 
 6
 W.Va.Code Sec. 61-3B-3 (emphasis added).
 
 
 7
 A glance at history helps to explain the statutes. West Virginia long has been concerned about the interaction between the state police, employers, and striking employees. It has sought to redress the problem "whereby employers of labor would have certain of their watchmen or peace conservators commissioned as deputy sheriffs so as to give them the standing of public officials in the discharge of their duties to their employers." Ferrell v. State Compensation Comm., 114 W.Va. 555, 556, 172 S.E. 609, 610 (1934). Several other West Virginia statutes attempt to prohibit county law enforcement officials from using their official status to aid employers. See, e.g., W.Va.Code Secs. 6-3-1(b)(3), 6-3-1a(c), 6-14-15a. In 1919, contemporaneous with the creation of the Department of Public Safety (now called the "Police"), West Virginia enacted the Neutrality Statute. Apparently, the Neutrality Statute's provisions and other now-repealed laws limiting police contact with coal mine employers sought to reassure citizens that the Police would not become an armed agent of employers rather than the State.
 
 
 8
 The Trespass Statute, however, does not appear to have been intended to ensure the State's neutrality with respect to the employees and employers; rather, the statute appears to have been enacted to remove the State from areas arguably under federal control. The statute was enacted in 1978 after the Supreme Court decided several cases involving the First Amendment, picketing on private property, and the National Labor Relations Act ("NLRA"), in particular, 29 U.S.C. Sec. 158. See Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978); Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). Several other states also amended their trespassing statutes; however, unlike West Virginia, their statutes specifically exclude only lawful activities.[2] Nothing in the Trespass Statute conditions the statute's exemption on the NLRA or on a finding that the activities are lawful.
 
 
 9
 In March 1989 when the Police anticipated a possible strike at another mine, Pittston Coal Mine, they promulgated an interpretation of the two statutes. The interpreting memorandum of March 29, 1989 stated that the Neutrality Statute meant that "[t]roopers are simply proscribed from taking sides or doing anything not clearly in pursuit of legitimate law enforcement." The memorandum continued, "Assaults, batteries and destruction of private and public property should be prevented and treated as any crime.... However, labor demonstrators on private roads or land should not be bothered until appropriate warrants or court orders are obtained by the owners of said private roads or land."[3]
 
 II. The Rum Creek Coal Strike
 
 10
 Later in 1989, the Company began to feel the effect of the statutes. Since April 1989, in the Rum Creek vicinity, the International Union, United Mine Workers of America ("UMWA") employees of Pittston Coal had been on strike. Around August 14, UMWA members began picketing activities at the Company's property in Rum Creek. The Company owned a coal mine and leased a nearby preparation plant. The Company used nonunion companies to truck the coal from the union mine and to run the preparation plant.[4] To get to the plant, the trucks had to drive down a public road and then cross the Company's private bridge onto its land. During the first few days of activity, the striking pickets formed a picket line across the Company bridge. They then barricaded the bridge with trees and scrap appliances and threw rocks and "other projectiles" at the Company's trucks. The Police, not yet apprised of a "labor dispute" in progress, apparently arrested some of the pickets. The Company has claimed that the Police's actions enabled it to continue transporting coal to the preparation plant.
 
 
 11
 Several days later on August 18, however, the UMWA announced a "selective strike" at the Company's mine and preparation plant. Picketing continued. Over the following days, the Company was unable to transport coal to its preparation plant, employees were injured, and the Company was almost shut down. Neither the Police nor the Company appear to dispute that serious and substantial harm occurred.[5] During this period, in increasingly frantic letters, the Company repeatedly requested that the Police remove the pickets and investigate alleged criminal acts. But as the district court judge found, "The policy of the Department of Public Safety is and has been that arrests may be made on private property for all other criminal acts except mere trespass during a labor dispute and such [other] arrests have been made." He added, however, "the members of the Department have consistently refrained from interfering in matters involving labor demonstrations or trespass on private roads or lands in connection therewith...." And he concluded, the Police "were ineffective in preventing violence on Rum Creek's premises."
 
 
 12
 The Company has alleged that a pattern of picketing violence and Police inaction developed and endured. According to the Company, the Police placed its patrols on the public road, too far from the pickets to identify violators of other West Virginia statutes. The Police apparently believed that the Trespass Statute prevented them from removing pickets who unlawfully physically obstructed the Company's private egress and ingress over the privately owned road. The Company also has claimed that the Police threatened to arrest Company representatives who sought to remove the pickets; the Police perceived such actions as assaults, legal violations which they could enforce. The Company has testified that the controversy caused expense of over $98,000, layoffs of one hundred employees, a drop to less than three percent of usual production, and $3.2 million in lost revenues. The Company was not alone in incurring costs because of the strike. The Police, despite their inaction in removing the trespassers or in securing the Company's roads from the illegal action, brought in additional officers from across the state. The bill for overtime, hotel bills, and food, according to the Police, was approximately $500,000.
 
 
 13
 On November 29, 1989, the Company brought a suit for declaratory and injunctive relief under 28 U.S.C. Sec. 2201 and 42 U.S.C. Sec. 1983.[6] It then filed a motion for a preliminary injunction to stop the Police from enforcing the statutes.
 
 
 14
 III. The District Court's Opinion and Arguments on Appeal
 
 
 15
 After fairly extensive hearings in early January, 1989, the district court judge denied the preliminary injunction. The judge began his legal conclusions by stating that "[e]xcept for the provisions of the statutes aforesaid, it is unconscionable that the officers of the Department of Public Safety should fail to act within the limits of its resources to prevent the continuing violence on Rum Creek's private property." The judge then noted that Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir.1977) guided his decision. In his short analysis, the judge stated that "[w]hile irreparable injury to the plaintiff was established, the statutory inhibitions of the State of West Virginia and its limited resources renders [sic] it incapable of controlling the source of the injury suffered...." The judge continued, "[t]he Court concludes that the public interest and public harm which would be visited upon the State ... mitigates against granting the injunction.... The Court is of the opinion that it should not afford the plaintiff injunctive relief absent a judicial determination that the criminal statute ... 61-3B-3 is unconstitutional and void...." The court, however, did not address or make such a determination and denied the motion. The Company appeals the denial.
 
 
 16
 The Company argues that the district court judge erred in denying a preliminary injunction by not applying correctly the balance of hardship test required by Blackwelder. The Company maintains that the balance of hardship test tilts toward the Company: the Company faced the total loss of its business; the Police merely would have to provide the same protection as they provide to others. Moreover, the Company claims that serious issues for litigation have been raised; indeed, the Company urges us to decide the case on the merits. The Company gives three bases on which to declare the statutes unconstitutional: federal preemption, the Equal Protection Clause, and the Due Process Clause.
 
 
 17
 The Police argue that the denial of the preliminary injunction should be upheld. The granting of the preliminary injunction according to the Police would change the status quo and require the Police to deploy additional forces, increasing the cost to the public and decreasing police protection elsewhere. In addition, the Police claim that the statutes are not unconstitutional and, thus, the Company has no possibility of success. The Police also assert that the statutes represent a legitimate exercise of police power, designed to address a history of labor disputes in West Virginia and federal authority over labor disputes. The Police claim not to have affirmative duties of protection.
 
 IV. Discussion
 A. Standard of Review
 
 18
 An abuse of discretion standard of review applies. As a Fourth Circuit district court has articulated,
 
 
 19
 the decision to grant a preliminary injunction is discretionary with the district court and may not be set aside on appeal unless an abuse of discretion is shown. Of course, a judge's discretion in granting or denying relief is not boundless and an appellate court will overturn a district court's decision if made under an improper legal standard.
 
 
 20
 Virginia Chapter, Associated General Contractors v. Kreps, 444 F.Supp. 1167 (W.D.Va.1978) (Turk, C.J.); see Merrill Lynch, Pierce, Fenner & Smith v. Bradley, 756 F.2d 1048, 1054 (4th Cir.1985). Factual findings under the abuse of discretion standard are reversed only if " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Zepeda v. United States INS, 753 F.2d 719 (9th Cir.1983) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 21
 At the outset, we pause to explain that our inquiry is limited to the Trespass Statute; indeed, our reference to the Trespass Statute only addresses the last provision, Sec. 61-3B-3(d), of the Trespass Statute. Although the Company has pointed repeatedly to the violence which it suffered, neither statute condones such violence. The Police memorandum specifically stated that it would enforce the laws respecting assault and battery and damage to private property. The Company has alleged, it is true, a Police practice of parking the patrol cars only on the public road, a disadvantageous vantage point from which to observe potential incidents of violence. Although some testimony appears in the record suggesting that the Police believed that the statutes required such a practice, it is unclear whether the Police actually conducted enforcement in such a fashion, whether such enforcement would have been unusual, and whether such enforcement was the cause of a Police inability to identify violators of the West Virginia laws. We do not believe that the Neutrality Statute on its face mandates a hands-off policy; rather, the most obvious construction would be a mere reminder of even-handed enforcement. The district court judge also appeared to perceive that the problems lay more with the Trespass Statute than with the Neutrality Statute. He found that the Police had made all the arrests required under the two statutes. Thus, at this time, we defer to the district court's apparent judgment that the Neutrality Statute did not present a problem of constitutional dimension justifying a preliminary injunction.
 
 
 22
 With respect to the Trespass Statute, however, the district court judge, "in applying the appropriate standards, ... misapprehended the law with respect to the underlying issues in litigation." Zepeda, 753 F.2d at 725. Such misapprehension is understandable because the issues involve recent Supreme Court decisions respecting Sec. 1983 and the complex interrelationship between state and federal laws in the labor-management relations area. The Fourth Circuit has not addressed those issues and we believe that guidance in the area will assist the district court judge. Several times during the hearings and in the order, the judge expressed concern over the Trespass Statute's constitutionality. Inexplicably, he seems to have doubted his power a) to declare that, for the purposes of a preliminary injunction, the Company would likely succeed in establishing the unconstitutionality of the Trespass Statute, and b) to enter a preliminary injunction prohibiting its enforcement. A district court can enter a preliminary injunction prohibiting state enforcement activities pending final resolution of a case in federal court alleging that state or local statutes are unconstitutional. See Doran v. Salem Inn, Inc., 422 U.S. 922, 931-34, 95 S.Ct. 2561, 2567-69, 45 L.Ed.2d 648 (1975).
 
 
 23
 Furthermore, even with regard to the Trespass Statute, because many facts remain in dispute, we decline to rush to decide the case on the merits.[7] See A.T. Massey Coal Co. v. Int'l Union, UMWA, 799 F.2d 142, 146-47 (4th Cir.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1964, 95 L.Ed.2d 536 (1987). What we have to say is applicable only at the preliminary injunction stage.
 
 B. The Blackwelder Standard
 
 24
 The standard for preliminary injunctions is established in this Circuit by Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir.1977). Blackwelder clarified that a hardship balancing test applies to determine the granting or denial of a preliminary injunction. See L.J. By and Through Darr v. Massinga, 838 F.2d 118 (4th Cir.1988), cert. denied, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989). Four factors must be considered:
 
 
 25
 (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
 
 
 26
 (2) the likelihood of harm to the defendant if the requested relief is granted,
 
 
 27
 (3) the likelihood that the plaintiff will succeed on the merits, and
 
 
 28
 (4) the public interest.
 
 
 29
 Massinga, 838 F.2d at 120. The irreparable harm to the plaintiff and the harm to the defendant are the two most important factors. If, after balancing those two factors, the balance "tips decidedly" in favor of the plaintiff, see Merrill Lynch, 756 F.2d at 1054, a preliminary injunction will be granted if "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Blackwelder, 550 F.2d at 195; see Todd by Todd v. Sorrell, 841 F.2d 87, 88 n. 2 (4th Cir.1988). As the balance tips away from the plaintiff, a stronger showing on the merits is required. See Telvest, Inc. v. Bradshaw, 618 F.2d 1029 (4th Cir.1980).
 
 
 30
 The Police have argued that a preliminary injunction will change the status quo. The rationale behind a grant of a preliminary injunction has been explained as preserving the status quo so that the court can render a meaningful decision after a trial on the merits. See Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806, 813 (3d Cir.1989); Federal Leasing v. Underwriters At Lloyd's, 650 F.2d 495 (4th Cir.1981); Compact Van Equipment Co. v. Leggett & Platt, Inc., 566 F.2d 952, 954 (5th Cir.1978). The phrase, "preservation of the status quo," however, does not symbolize an additional separate test. See Ortho Pharmaceutical, 882 F.2d at 814. We prefer not to label a particular moment in the past the "status quo." When the current statute is alleged to be unconstitutional, and continued adherence to the statute pending the trial may affect the court's ability to render a meaningful decision, the Blackwelder standard properly applies. Cf. Ortho Pharmaceutical, 882 F.2d at 814. Furthermore, we realize that the line between prohibiting the specific enforcement of a statute and mandating another approach to enforcement is often blurry. At this time, we only consider whether or not to prohibit the Police from enforcing the final proviso of the Trespass Statute. Because we do not specifically hold that the Police or State must adopt a different approach, but instead leave the matter to reexamination by the district judge, see United States v. Price, 688 F.2d 204, 212 (3d Cir.1982), and because we do not grant the Company all the relief it seeks, see Johnson v. Kay, 860 F.2d 529, 540-41 (2d Cir.1988), we do not consider the preliminary injunction to be a "mandatory" one. Even if our decision were classified as "mandatory," the Blackwelder standard would apply. See Wetzel v. Edwards, 635 F.2d 283, 286-87 (4th Cir.1980).
 
 C. The Balance of Hardship
 
 31
 1. Irreparable Harm to the Company Absent a Preliminary Injunction
 
 
 32
 To succeed, the Company must show that it will sustain irreparable harm without a preliminary injunction. The "balance of hardship" test does not negate the requirement that the Company show some irreparable harm. See Federal Leasing, 650 F.2d at 449 (distinguishing between a "likelihood" and "possibility" of irreparable harm). The district court found "irreparable injury to the plaintiff." The Company emphasizes that it lost revenue, suffered damage to equipment and danger to employees, and, at times, was forced to shut down. The Police argue that irreparable injury requires more than the loss of money; in this instance, the Company can avoid future losses by enforcing other injunctions (those against the UMWA) and proceeding directly against the pickets.
 
 
 33
 Although the district court judge found that "irreparable injury to the plaintiff was established," he did not clarify whether he referred to future irreparable harm. We believe, however, that future irreparable harm could be found likely to occur to the Company in the absence of a preliminary injunction. The Fourth Circuit has not addressed what showing is necessary to demonstrate irreparable harm in a Sec. 1983 suit against state officials seeking to stop enforcement of an allegedly federally-preempted state statute. We believe that a) the Company's ability to bring other judicial remedies against the UMWA does not diminish its showing of irreparable harm and b) the inability to obtain damages from the State in a Sec. 1983 action reduces the showing necessary to establish irreparable harm.
 
 
 34
 The harm to be suffered by the Company arises from the UMWA and Police actions. As long as the Trespass Statute is enforced, the UMWA may enter the Company's property, obstruct egress and ingress, and refuse to leave. The Company has resorted to state remedies against the UMWA and sought the assistance of the NLRB. But, claims of violations between labor and management under the NLRA differ from "claims of governmental interference with interests protected by the Act." Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 450 n. 5, 107 L.Ed.2d 420 (1989) (Golden State II ). Against governmental interference, the Company may seek vindication under Sec. 1983, which provides " 'a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.' " Wilson v. Garcia, 471 U.S. 261, 272, 105 S.Ct. 1938, 1944, 85 L.Ed.2d 254 (1985) (quoting Mitchum v. Foster, 407 U.S. 225, 239, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972)). The history of Sec. 1983 demonstrates that a constitutional or federal statutory violation creates a special harm. Indeed, plaintiffs in Sec. 1983 actions have not been required to exhaust state administrative remedies. See Felder v. Casey, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988); Patsy v. Board of Regents of Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Regardless of the UMWA's future behavior, either of its own accord or under judicial command, the Police's refusal to act because of the Trespass Statute creates the ever present danger of irreparable harm. The Company's option to bring other actions against the UMWA, which in theory would make the nonenforcement of the Trespass Statute less egregious, does not alter the underlying and inescapable fact that the Police's enforcement of the Statute's proviso during labor disputes, especially in the absence of alternative methods of relief against other parties, will hang like a brooding omnipresence in the sky and may likely result in the Company experiencing harm to its employees and to its business. Cf. Johnson, 860 F.2d at 538; Atlantic Richfield Co. v. United States, 774 F.2d 1193, 1198-99 (D.C.Cir.1985); Williams v. Spencer, 622 F.2d 1200, 1204 (4th Cir.1980).
 
 
 35
 In addition, the conclusion that, in most circumstances, "the possibility that adequate compensatory or other corrective relief will be available at a later date ... weighs heavily against a claim of irreparable harm," Kreps, 444 F.Supp. at 1182, is not present here. Although, as we discuss below, the recent broadening of Sec. 1983 may permit a suit, see Golden State II, 110 S.Ct. 444, the simultaneous narrowing of remedies available under Sec. 1983, limits the Company's ability to obtain damages. The Police--state officials in their official capacity--can be enjoined under Sec. 1983; but the Police probably cannot be sued for damages. See Will v. Michigan, 491 U.S. 58, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989); Kentucky v. Graham, 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985).[8] No other form of redress appears available if the preliminary injunction is denied and, later on the merits, a constitutional violation is found to have occurred. Section 1983 limits remedies against the State, in the absence of congressional abrogation or the State's waiver of immunity, to injunctive and declaratory relief.
 
 
 36
 The case thus can be distinguished from those cited by the Police. In Wetzel v. Edwards, 635 F.2d 283 (4th Cir.1980), the appellate court found that, if a prisoner later was found to have been improperly denied access to rehabilitative programs at his current prison, the parole considerations could be adjusted to account for the denial. No such adjustment will be available to the Company. Unlike Kreps where the plaintiffs' "costs without an injunction are negligible," Kreps, 444 F.Supp. at 1182, the Company faces severe monetary damage to its business, physical harm to employees, and substantial litigation in alternative forums to attempt to minimize the severe damage. And, the past history of the strike demonstrates that the harm will be far more than merely the resulting uncertainty from allegedly unconstitutionally vague standards. See Hanky v. City of Richmond, 532 F.Supp. 1298 (E.D.Va.1982).[9]
 
 
 37
 If the court eventually decides that the Trespass Statute and the Police's conduct with respect to it violate the Company's federally-protected rights, the Company will be unlikely to collect monetary damages from the State for those violations.[10] Hence, because current Supreme Court cases suggest that the only remedy available to a plaintiff who alleges that a State or State official has violated rights under Sec. 1983 is an injunction and declaration against the State, the showing necessary to meet the irreparable harm requirement for a preliminary injunction should be less strict than in other instances where future monetary remedies are available.[11] Cf. Zepeda, 753 F.2d at 727 (finding that plaintiffs "demonstrated a possibility of irreparable injury by showing violations of their constitutional rights, which if proven at trial, could not be compensated adequately by money damages and by showing that the INS was reasonably likely to continue those practices.").[12] Police officials have testified that, freed from the Trespass Statute, they could control future damage to the Company. The Police, nevertheless, will not alter nonenforcement in the absence of a preliminary injunction. Without a preliminary injunction, the Company will face probable irreparable harm from the alleged violation of a federally protected right and will be prevented from recovering monetary compensation from the State. Any recovery from other participants will not redress the Sec. 1983 cause of action. The Company appears to have shown a likelihood of irreparable injury.
 
 2. Likelihood of Injury to the Defendants
 
 38
 Balanced against the showing of likely irreparable injury is the likelihood of injury to the defendants. The Police argue that the avoidance of such injury and the public interest are one and the same. The Police cite Kreps and Hanky to support their merger of the public interest and likelihood-of-injury-to-defendant factors. Kreps, however, addressed the public interest factor separately. See Kreps, 444 F.Supp. 1183. In Hanky, the City provided extensive support for its contention that an injunction would jeopardize a city plan for preventing erosion of a retail core. Blackwelder commands that the two factors be considered separately.
 
 
 39
 The Police argue that the injunction will require additional police power, resulting in the reduction of police forces for other parts of the state. Similar claims were presented by the State in Massinga. We stated that "if carried to their logical extreme, federal courts would be powerless to enforce federal rights in any case where enforcement would conflict with the rights of a state." 838 F.2d at 121. The Police's "real harm is the expenditure of money." Id. Prohibiting the enforcement of the proviso of the Trespass Statute does not necessarily lead to increased expenditure. The Police already have been patrolling the area and are obliged to enforce the other West Virginia laws. No West Virginia law permits the Police to abandon all law enforcement activities during a labor dispute. Moreover, the Police apparently told the pickets that they would not be removed for illegal obstruction or criminal trespass. Had the Police been able to remove pickets not engaged in lawful picketing activities, the level of violence might have decreased, resulting in a lowered cost to the Police. Indeed, certain police force members testified, and the district court found, that the inability of the Police to control the violence was due in large part to the Trespass Statute.[13] Little harm has been shown as likely to accrue to the defendants if the Trespass Statute proviso is not interpreted as the Police contend. The balance of hardships appears decidedly to favor the plaintiffs.
 
 D. Likelihood of Success
 
 40
 Because the hardship balance appears to favor the plaintiff, the Company need only show "grave or serious" questions for litigation. Massinga, 838 F.2d at 120. As discussed below, we believe that the Company has shown such grave or serious questions arising from the preemption argument. Having concluded that on federal preemption grounds alone, the district court judge could enter a preliminary injunction, we decline to engage in a lengthy discussion about Equal Protection Clause[14] or Due Process Clause[15] arguments.
 
 
 41
 The preemption issue involves the National Labor Relations Act and the Trespass Statute. The Trespass Statute appears to have been an attempt by the West Virginia legislature to ensure that the state did not infringe on NLRA jurisdiction. In Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), the Court considered whether the NLRA deprived a "state court of the power to entertain an action by an employer to enforce state trespass laws against picketing which is arguably--but not definitely--prohibited or protected by federal law." Id. at 182, 98 S.Ct. at 1749. In an opinion by Justice Stevens, the Court concluded that, under the Garmon doctrine, neither the arguably protected character of the picketing, nor the arguable illegality of it, deprived the state courts of jurisdiction. Id. at 198, 207, 98 S.Ct. at 1758, 1762-63. The picketing at issue was peaceful, orderly, and nonobstructive. Both Justice Stevens' opinion and that of Justice Brennan emphasized that "state courts have jurisdiction over picketing that is obstructive, or involves large groups of persons, or otherwise entails a serious threat of violence." Id. at 226-27, 98 S.Ct. at 1773. If West Virginia's enactment of the Trespass Statute proviso was intended to respond to Sears, Roebuck, the statutory language calling for the complete evisceration of the Trespass Statute during a labor dispute appears to have gone beyond even the concerns of Justice Brennan's dissent in that case. Moreover, Sears, Roebuck did not address state laws, but rather, state courts.
 
 
 42
 The case before us falls within another preemption doctrine. In Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (Golden State I ), the Court considered whether the city's conduct in conditioning a taxicab franchise renewal on resolution of a labor dispute was preempted by the NLRA. The Court concluded that the city's conduct was preempted by the NLRA. In Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (Golden State II ), the Court addressed the possibility of a Sec. 1983 action for the violation. In an opinion by Justice Stevens, the Court held that the violation did permit a Sec. 1983 remedy. Both Golden State cases examined the city's conduct under a preemption doctrine associated with Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Com'n, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Justice Stevens explained that the Garmon doctrine focused on the notion of "primary jurisdiction"--"that state jurisdiction over conduct arguably protected or prohibited by the NLRA is preempted in the interest of maintaining uniformity in the administration of the federal regulatory jurisdiction." Golden State II, 110 S.Ct. at 451. Machinists, however, recognized a federal right for parties to a collective bargaining agreement to make use of " 'economic weapons,' not explicitly set forth in the Act, free of governmental interference." Id. (quoting Machinists, 427 U.S. at 150, 96 S.Ct. at 2558). The NLRA has been construed as signifying congressional intent to "create a free zone from which all regulation, 'whether federal or State,' is excluded." Id. (quoting Machinists, 427 U.S. at 153, 96 S.Ct. at 2559) (citations excluded). The Court emphasized that the right involves "being free of governmental regulation of 'the peaceful methods of putting economic pressure upon one another.' " Id. 110 S.Ct. at 452 (quoting Machinists, 427 U.S. at 154, 96 S.Ct. at 2560). Permissible economic tactics that employers and employees have a right to use without state infringement include striking and withstanding strikes. See Golden State I, 475 U.S. at 615, 106 S.Ct. at 1399; see also Golden State II, 110 S.Ct. at 452 (finding that refusal to renew the license "violated petitioner's right to use permissible economic tactics to withstand the strike").
 
 
 43
 Some limits exist to the Machinists preemption doctrine. In Charlesgate Nursing Center v. State of R.I., 723 F.Supp. 859, 865 (D.R.I.1989), the district court noted that a narrow exception permits states to legislate in areas with a peripheral impact on matters governed by federal labor law. Such areas are those "of vital local concern such as health or welfare benefits and the prevention of violence or tortious acts." 723 F.Supp. at 865; see Machinists, 427 U.S. at 136-37, 96 S.Ct. at 2551-52. In the context of a Maine statute requiring severance pay, the Supreme Court has stated that "preemption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State." Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 21, 107 S.Ct. 2211, 2222, 96 L.Ed.2d 1 (1987). However, one area that remains free for the State to control is legislation designed to regulate "conduct physically injuring or threatening to persons or property." Machinists, 427 U.S. at 151 n. 13, 96 S.Ct. at 2558 n. 13; see id. at 136, 96 S.Ct. at 2551. Machinists specifically referred to "state court power to enjoin striking employees from ... obstructing or attempting to obstruct ... free ingress or egress to and from the property." Id. at 137 n. 2, 96 S.Ct. at 2551 n. 2.
 
 
 44
 The Trespass Statute appears, however, to infringe on an area preempted by federal law, namely, the Company's ability to withstand a strike furthered by violent and illegal means. We recognize that the connection between the Trespass Statute and the Company's ability to withstand a strike is not as direct as in the Golden State cases, where the taxicab company could not operate without the franchise renewal and the renewal was directly conditioned on the settlement of the labor dispute. However, in Machinists, the Supreme Court wrote that "the inconsistent application of state law is necessarily outside the power of the State." 427 U.S. at 153, 96 S.Ct. at 2559 (quoting Teamsters Union v. Oliver, 358 U.S. 283, 296, 79 S.Ct. 297, 304-05, 3 L.Ed.2d 312 (1959)). As Judge Torres stated in Charlesgate, "[p]reemption doctrine prohibits state action that infringes on such rights in more than a collateral way as well as action that completely eliminates them." 723 F.Supp. at 866. The Police have argued that the Trespass Statute seeks to compensate for the relatively isolated location of coal companies; peaceful picketing has less effect, it argues, in lonely locales. However, the Court has stated that "the economic weakness of the affected party cannot justify state aid contrary to federal law...." Machinists, 427 U.S. at 149, 96 S.Ct. at 2557. The state aid in Machinists was the Wisconsin Supreme Court's holding that the union's refusal to work overtime constituted an unfair labor practice under state law.
 
 
 45
 In the absence of a strike, the Police may enforce the Trespass Statute untrammeled by the labor dispute proviso. For example, if members of an Organization Against Coal Companies decided to enter Company land and block the ingress and egress, the Police would remove the people. But once a strike is declared, the Trespass Statute becomes impotent under the Police's interpretation. During a strike, even persons completely unassociated with the striking employees apparently could not be barred from entering the Company's private property. The Trespass Statute, as the Police interpret it, does not attempt to carve out only legal strike activities--but rather erases any and all protection against criminal trespass during a labor dispute.[16] The ability to withstand a strike or to strike requires that the parties may resort to those laws not preempted by the NLRA. Part of the laws of West Virginia include laws against criminal trespass.[17] Removing from consideration the extent that the Trespass Statute infringes on the employee's right lawfully to picket, see Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), West Virginia's enforcement of the section (d) proviso is preempted by federal law. As the Court in Machinists twice emphasized, "For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits." 427 U.S. at 144, 146-47, 96 S.Ct. at 2555, 2556.
 
 
 46
 The Trespass Statute does not fall within the narrow exception for concern as to certain local activities with little impact of federal labor law. Although West Virginia has faced a long history of coal mining struggles, the Trespass Statute proviso was not passed until 1978. It appears to have been motivated less from local concern than from a desire to avoid interference with the NLRA. In addition, if any area remains free to the states it is the State's traditional police power to prevent violent acts--arguably the direct opposite of the Trespass Statute's effect. The Police have referred to a number of state statutes designed to prevent states from infringing on federally protected rights. All are more narrowly written than West Virginia's Trespass Statute, limiting the nonapplication of a trespass statute to lawful labor union activities or activities subject to the regulation of the NLRA. See supra note 2.
 
 
 47
 The preemption argument, thus, raises serious, substantial, and worthy issues for litigation. The Police have not yet shown any arguments suggesting a contrary conclusion. Some such arguments may emerge; however, at the present stage, the Trespass Statute appears preempted.
 
 E. The Public Interest
 
 48
 The Company claims that deterring violence places the public interest on its side. The Police claim that the dereliction of other duties and enforcement created by placing additional forces at Rum Creek pushes the public interest factor to its side, even though the interpretation appears to have promoted violence. Both sides also have sought support from the argument that it is in the public interest to have, either, according to the Company, preempted laws struck down, or, according to the Police, local laws upheld. The public interest factor does not appear always to be considered at length in preliminary injunction analyses. See, e.g., Jones v. Board of Governors of Univ. of N.C., 704 F.2d 713, 717 (4th Cir.1983) (summarily noting the public interest). As one district court stated:
 
 
 49
 [i]n this case, as in many, it is difficult to ascertain where the public interest rests.... Both sets of parties assert basic rights fundamental to our nation.... In short, the court cannot easily align the parties so as to place one on the side of the public interest.
 
 
 50
 Kreps, 444 F.Supp. at 1185-86. The Trespass Statute appears quite likely preempted by federal law and thus, if we had to align the public interest with anyone, we would align it with the Company. See Decker v. U.S. Dep't of Labor, 473 F.Supp. 770, 776 (E.D.Wis.1979). We conclude that the public interest does not appear to alter the conclusion to be drawn from the other factors.
 
 
 51
 As this Circuit has stated,
 
 
 52
 We of course venture no opinion as to facts that should be found, nor upon whether and how any facts that may be found will invoke the controlling doctrine. We hold only that the questions of fact and law raised on the record at this point are, under controlling doctrine, sufficiently serious and grave ones that, when considered with the balance of potential harms, the district court's injunctive order should stand pending trial.
 
 
 53
 Jones, 704 F.2d at 717. The district court judge did not enter an order for preliminary injunction; hence we reverse the denial of the preliminary injunction and remand for the judge to consider whether or not, in light of the evidence before him, a preliminary injunction should be entered in accordance with the concerns addressed in our opinion. If the entry of a preliminary injunction is proper, the court need not invalidate the entire Trespass Statute. Cf. Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 501-02, 105 S.Ct. 2794, 2800-01, 86 L.Ed.2d 394 (1985) ("Facial invalidation of the statute was ... improvident" and "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it."). The district court's order merely need preliminarily enjoin enforcement of the proviso of Sec. 61-3B-3(d).
 
 
 54
 REVERSED AND REMANDED.
 
 
 
 [1]
 We refer to the defendants/appellees as the "Police," although the named defendants included W. Gaston Caperton, Governor and Chief Executive Officer of the State of West Virginia, Colonel J.R. Buckalew, the administrative head of the West Virginia Department of Public Safety and Superintendent of the West Virginia State Police, and officers or agents of the West Virginia State Police. All defendants were sued in their official capacities
 
 
 [2]
 See, e.g., Cal.Penal Code Sec. 602(n) (1982) (trespassing provision "shall not be applicable to persons engaged in lawful labor union activities which are permitted to be carried out on the property by the California Agricultural Labor Relations Act ... or by the National Labor Relations Act"); New Mex.Code Sec. 30-20-13(E) ("Nothing in this section [on criminal trespass] shall be construed to prevent lawful assembly and peaceful and orderly petition for the redress of grievances, including any labor dispute"); Haw.Rev.Stat. Sec. 708-814(1)(b) (1988) (criminal trespass in the second degree does not apply to persons remaining unlawfully on commercial premises after a request to leave if the "conduct or activity [is] subject to regulation by the National Labor Relations Act"). The NLRA permits peaceful picketing; however, "unlawful acts of trespass and violence against the employer's property" are not protected by the NLRA. Methodist Hospital of Kentucky v. NLRB, 619 F.2d 563, 567 (6th Cir.), cert. denied, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980)
 In Louisiana, 1976 and 1977 amendments deleted a paragraph exempting legitimate labor activities from the statutes relating to criminal trespass and breach of the peace. See La.Rev.Stat. Secs. 14:63.3, 14:63.4, 14:100.1, 14:103. With respect to educational institutions, legitimate lawful activities by labor organizations are permitted. See La.Rev.Stat. Secs. 14:328-329.5, 17:3108.
 
 
 [3]
 The memorandum did not refer specifically to West Virginia Code Sec. 61-3B-3 (the Trespass Statute) but did include Sec. 15-2-13 (the Neutrality Statute) verbatim. The record does not indicate whether the memorandum was a new construction of the two statutes or merely represented current practice. In addition, the record does not disclose the practices followed by the Police prior to the 1978 passage of the Trespass Statute proviso
 
 
 [4]
 According to testimony given by Richard Zigmond, President of the Company, the Company's mine, Rock Run, was operated by the Rock Run Mining Company. The UMWA represented the employees. During early 1989, Barrachah Mining, Inc. ran the preparation plant. The UMWA also represented Barrachah's employees. About June 1989, the UMWA began an alleged secondary boycott strike which apparently shut down Barrachah and Rock Run Mining. Con-Serv, Inc. and Mate Creek Trucking took over trucking and preparation. Neither company's employees were represented by the UMWA
 
 
 [5]
 We emphasize that the conduct of the pickets does not appear to have been of the type even arguably protected by the First Amendment or the NLRA. Indeed, at one point in the hearings on the motion for a preliminary injunction, the district judge became shocked by the violence, stating "it seems to me savagery almost, uncivilized conduct." He twice asked if the Company was sure that the pickets had in fact been associated with the UMWA and not "some hoodlums that had gotten loose in the area."
 
 
 [6]
 Several other forms of judicial relief were also sought. The Company received a temporary injunction from the Circuit Court of Logan County, West Virginia on September 10, 1989. The order prohibited the UMWA from obstructing the ingress and egress, trespassing, attacking Company employees, damaging vehicles, or doing other unlawful acts. Apparently, a permanent injunction was granted on September 20. In addition, the Company raised the matter with the National Labor Relations Board ("NLRB"). The NLRB obtained a temporary injunction against the UMWA under Sec. 10(j) of the NLRA, 29 U.S.C. Sec. 160(j), enforceable by the United States Marshals. Both injunctions considered the actions of the UMWA; they did not address the constitutionality of the statutes or the actions of the Police. We do not construe the Police's claim to include the argument that the other judicial orders, involving altogether distinct defendants, barred the Company's suit for declaratory and injunctive relief under Sec. 1983
 
 
 [7]
 For example, did the Police prevent the Company from using self-help measures? Did the Police create danger and vulnerability for the Company? Would the enforcement of the prior-obtained injunctions against the UMWA have lessened the danger to the Company? Would picketing activities legal under the First Amendment and the NLRA have produced a similar outcome for the Company? Without the Trespass Statute, would the Police have been able to control the violence? Prior to the 1978 passage of the Trespass Statute, what was the Police's policy of enforcement during labor disputes? Prior to the 1989 Memorandum, what was the Police's policy of enforcement during labor disputes?
 
 
 [8]
 These cases do not alter the ability to sue a state official for injunctive relief because the action is not perceived as one against the State. No Eleventh Amendment problems are raised. See Will, 109 S.Ct. at 2311 n. 10; Graham, 473 U.S. at 169 n. 18, 105 S.Ct. at 3107 n. 18; see also Artist M. v. Johnson, 917 F.2d 980 (7th Cir.1990); Meares v. Brunswick County, N.C., 615 F.Supp. 14, 15 (E.D.N.C.1985) ("A court of the United States may enjoin a state official from enforcing an unconstitutional law and such an injunction does not affect the State in its sovereign or governmental capacity.")
 
 
 [9]
 The present case also differs from American Hospital Ass'n v. Hansbarger, 594 F.Supp. 483 (N.D.W.Va.1984). The Police suggest that the court found that the length of time the plaintiffs had to bring a suit under the statute was determinative that no irreparable harm occurred. Prior to discussing the delay, however, the district court found that the alleged irreparable harm--criminal charges and license suspension--had been denied even by the plaintiffs' witnesses. Furthermore, unlike the Company, the statute in American Hospital directly affected the plaintiffs who had notice of an obviously deliberate one-year delay to permit legal debate. The Company, however, only became affected by the statute when the labor dispute occurred and could have believed that the Police would construe the statute in a way other than that ultimately made explicit by the 1989 memorandum
 
 
 [10]
 The possibility of obtaining attorney's fees does not represent an adequate source of compensation. See Hutto v. Finney, 437 U.S. 678, 693-94, 699-700, 98 S.Ct. 2565, 2574-75, 2578-79, 57 L.Ed.2d 522 (1978); see also Will, 109 S.Ct. at 2322 (Stevens, J., dissenting)
 
 
 [11]
 Black United Fund of N.J., Inc. v. Kean, 763 F.2d 156, 161 (3d Cir.1985), contains a brief suggestion that inability to collect monetary damages under Sec. 1983 might not alter a preliminary injunction analysis. The statement is not dispositive. The Black United Fund court wrote, "the Eleventh Amendment would not bar a 1983 suit for damages against defendant in state court." However, Will now clarifies that damages are unavailable to plaintiffs suing a state or state officials in their official capacities in state court
 
 
 [12]
 The irreparable harm requirement has been less strictly construed in other areas in which remedies are governed by federal law. For example, courts have found the irreparable harm requirement unnecessary where an injunction is authorized by a federal statute. As the Ninth Circuit has stated, "[t]he function of a court in deciding to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants." United States v. Odessa Union Warehouse Co-op., 833 F.2d 172, 174-75 (9th Cir.1987) (finding no showing of irreparable injury necessary where the injunction was authorized by 21 U.S.C. Sec. 332(a) and statutory conditions had been satisfied). Similarly, the loss of First Amendment rights for even a short time has been considered irreparable injury. See Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)
 
 
 [13]
 The Police have argued that the Company cannot show harm because it could have enforced a state court or NLRA injunction against the UMWA. As noted above, the injunction against the UMWA does not address constitutional problems; however, the argument does serve to undercut the Police's cost contention. Assumably, the Police's cost of enforcing a state court injunction against unlawful picketing activities would not be markedly less than enforcing the same laws against unlawful picketing activities in the absence of a command from a state court
 
 
 [14]
 The Equal Protection Clause claim appears to suffer from an inability to assert the durational or residency requirements that have been often present in the few instances where a statute has been found unconstitutional under rational basis scrutiny. See Hooper v. Bernalillo County Assessor, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985) (invalidating New Mexico property tax exemption for Vietnam veterans who were state residents in 1976); Williams v. Vermont, 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985) (invalidating Vermont automobile use tax credit for out-of-state sales only to persons who were Vermont residents at the time of paying the taxes); Metropolitan Life Insurance Co. v. Ward, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (invalidating Alabama tax on out-of-state insurance companies); Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (invalidating Alaska's distribution of natural resource income to state residents based on numbers of years of residency); see also L. Tribe, American Constitutional Law Sec. 16-2, at 1442, 1448 n. 14 (2d ed. 1988)
 
 
 [15]
 The Due Process Clause claim, dependent on additional facts regarding the Police's and Company's actions, might deserve investigation. See DeShaney v. Winnebago County DSS, 489 U.S. 189, 200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., ... reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises ... from the limitation which it has imposed on his freedom to act on his own behalf."); Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir.1990) (stating that "a constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been at absent state action"); Ross v. County of Lake, 910 F.2d 1422, 1431 (7th Cir.1990) (finding that allegations that the county arbitration cut off private sources of revenue without providing a meaningful alternative presented a Sec. 1983 claim of a constitutional deprivation of life). Yet the Company's ability to seek other injunctions makes the due process issue problematic
 
 
 [16]
 The Trespass Statute is arguably vague. Possible questions are to whom and to what does the criminal trespass article apply? If there is a labor dispute, is all of West Virginia immunized from liability for criminal trespass? Are only the pickets immune? Could the Company picket the UMWA headquarters and prevent its executives from leaving the building? What constitutes a "labor dispute"? Cf. U.S. v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 1541-42, 91 L.Ed. 1877 (1947) (invalidating a statute where clearer and more precise language could have been easily used); City of Mesquite v. Aladdin's Castle, 455 U.S. 283, 290 n. 12, 102 S.Ct. 1070, 1075 n. 12, 71 L.Ed.2d 152 (1982) (invalidating a statute which failed to give adequate notice of prohibited conduct)
 
 
 [17]
 Nothing suggests that West Virginia should repeal its entire criminal trespass statute. If West Virginia chooses not to make criminal trespass illegal, then it would appear that the Company could not expect to rely on the statute as a means of withstanding a strike. Nor could others engaged in other activities be assured of state anti-criminal trespass action. Our analysis does not imply that states must pass certain statutes to avoid preemption; however, once a statute has become part of the background of permissible methods of legal redress in a nonstrike situation, to remove it solely in strike situations, while leaving it applicable to others in general, may jeopardize the employer's ability to withstand a strike
 Two Supreme Court cases at first glance appear to suggest a contrary conclusion; however, both are readily distinguishable. Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977), was challenged on equal protection grounds and preemption by the Social Security Act. The Court concluded that both arguments failed. We express no opinion as to the hypothetical result were the statute to be challenged today as preempted by the NLRA. However, central to the Court's concern was that the unemployment compensation statute had consequences "not only for the recipient of benefits, but also for the contributors to the fund and for the fiscal integrity of the fund." 431 U.S. at 491, 97 S.Ct. at 1909. If striking employees collected benefits, the contribution that the employer had to pay into the fund dramatically increased. Thus the statute did not merely provide employees with state support during a strike, it directly jeopardized the employer's ability to withstand the strike. "Qualification for unemployment compensation thus acts as a level increasing the pressures on an employer to settle a strike." Id. at 492, 97 S.Ct. at 1910. Lyng v. International Union, UAW, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), never could have created a preemption claim because the case involved an amendment to another federal statute, the Food Stamp Act, and the statute contained other provisos addressing the need to avoid favoritism in labor disputes. See id. at 372, 108 S.Ct. at 1193.