**MONONGAHELA POWER COMPANY, West Penn Power Company, and the Potomac Edison Company, Plaintiffs,**

**v.**

**William REILLY, Administrator, United States Environmental Protection Agency, Defendant.**

**Civ. A. No. 91–137–C.**

United States District Court, N.D. West Virginia.

June 3, 1992.

---

M. Blane Michael, Charleston, W.Va., William J. Murphy, Baltimore, Md., for plaintiffs.

Alan D. Greenbert, Patricia Embrey and Judy Tracy, Washington, D.C., Sherry E. Muncy, Elkins, W.Va., Patrick M. Flatley, Wheeling, W.Va., for defendant.

## ORDER

MAXWELL, Chief Judge.

In this action for declaratory and injunctive relief, plaintiffs, affiliated electric utility owners of power plants, seek judicial review of proposed actions and stated positions of the Administrator of the Environmental Protection Agency in relation to duties delegated by Title IV of the 1990 Amendments to the Clean Air Act. *See,* 42 U.S.C. §§ 7651–7651*o*. On January 21, 1992, the Court heard evidence and the argument of counsel pursuant to plaintiffs' motion for a preliminary injunction and defendant's motion to dismiss.

Title IV to the Clean Air Act was amended effective November 15, 1990, for the express purpose of reducing the adverse effects of acid rain precursors through reductions in annual emissions of sulfur dioxide and nitrogen oxides, said reductions to occur within specified deadlines. 42 U.S.C. § 7651(b). Having found that acidic compounds in the atmosphere have serious adverse effects on human health and the environment, 42 U.S.C. § 7651(a), Congress mandated that Title IV apply to the 48 contiguous states of the United States and that the emissions of sulfur dioxide and nitrogen oxides from utility steam electric plants be limited. The objective of the acid deposition control program established under Title IV is to reduce annual sulfur dioxide emissions by 10 million tons below 1980 levels and to reduce annual nitrogen

oxides emissions by 2.7 million tons from 1980 emissions levels. 42 U.S.C. § 7651(b).

The sulfur dioxide reduction program established under Title IV operates in two phases. Phase I begins January 1, 1995, at which time approximately 100 high-emitting utility units will be required to make reductions in their total annual sulfur dioxide emissions. 42 U.S.C. § 7651c. Plaintiffs are affected sources.[1] Phase II becomes effective January 1, 2000.

By utilizing a system of marketable allowances,[2] the reduction programs established by Title IV provide affected sources with a range of alternative choices for complying with emissions limitation requirements. *See generally,* 42 U.S.C. § 7651(b) and § 7651b. The ability of owners and operators to purchase allowances from other affected units or from the EPA was designed to create a market-based economic system for allowances, in which utilities would either shut down affected plants, change fuel sources, install scrubber technologies, or purchase allowances from other utilities that had achieved compliance through those means, depending on which methods of compliance were the most prudent for that utility.[3] Robert C. Byrd, *The Clean Air Act Amendments of 1990: An Innovative, but Uncertain Approach to Acid Rain Control,* 93 W.Va.L.Rev. 477, 479–481 (1991).

In Title IV, Congress established a Phase I emission allowance for Phase I affected units. *See,* 42 U.S.C. § 7651c, Table A. Effective January 1, 1995, it shall be unlawful for any of the Phase I affected units to emit sulfur dioxide in excess of its Phase I emission allowance *unless* the owner or

operator has substituted sufficient allowances from another of its units to that unit; has obtained an extension of the January 1, 1995 deadline through the installation of qualifying Phase I scrubber technology; or has purchased sufficient allowances from another affected owner or operator or from a pool of allowances maintained by the EPA. *See,* 42 U.S.C. § 7651c(a)(1).

The owners and operators of affected units under Phase I are required to submit permit applications and compliance plans to the EPA by February 15, 1993. 42 U.S.C. § 7651g(c). Each permit application must be accompanied by a compliance plan which specifies how the affected source will comply with the requirements of Title IV, the schedule for implementing its plan and whether the owner or operator intends to obtain additional allowances beyond its initial allocation. 42 U.S.C. § 7651g(b). The Administrator is required to review each compliance plan and approve or disapprove a complete submission within six months of receipt. 42 U.S.C. § 7651g(c)(2).

In an effort to comply with Phase I of Title IV of the CAAA, plaintiffs purport to install flue gas desulfurization technology ("scrubbers") on three coal-fired electric generating units at the Harrison Power Station, an affected source located in Harrison County, West Virginia.[4] Plaintiffs argue that Congress added an incentive for implementing scrubber technologies by creating Phase I "extension" and "bonus allowance" programs. Owners and operators of affected units may petition the EPA for a two-year extension of the Phase I deadline if qualifying Phase I scrubber technology is utilized.[5] 42 U.S.C.

---

1. Plaintiffs own or operate all or a portion of eleven generating units at five power stations that are included among the affected units. One such station is the Harrison Power Station located in Harrison County, West Virginia, which is within the Northern District of West Virginia.

2. An allowance allocated under Title IV is a limited authorization to emit one ton of sulfur dioxide in accordance with the emissions levels established by Title IV. 42 U.S.C. § 7651a(3).

3. Existing sources are allocated allowances based upon their historic fuel use and the emissions limitations set forth in Title IV.

4. Plaintiffs represent, and it is undisputed, that this project will require a capital investment in excess of 700 million dollars. Plaintiffs suggest that this is the least-cost means of compliance and it permits them to continue using their present fuel supply, high sulfur coal from northern West Virginia.

5. A source that applies for a two-year extension is eligible to receive the additional allowances it will need to cover its emissions during the extension period, as well as bonus allowances for use after the extension period.

§ 7651c(d). Critical to this litigation is the requirement that the EPA must review and take final action on each extension proposal received from affected sources "in order of receipt." 42 U.S.C. § 7651c(d)(3).

Importantly, an unlimited pool of "extension allowances" and "bonus allowances" was not created. It is conceded by both sides to this litigation that it is very likely that requests for allowances will exceed available allowances. Thus, the importance of first-come, first-served is realized.

Having now addressed the legislative background to plaintiffs' complaint, the Court will proceed to confront the issues raised by the complaint. On March 19, 1991, plaintiffs attempted to file with the EPA a joint Permit Application and Compliance Plan, an Application for Two–Year Extension, and a Request for Allowances.[6] In the Application, plaintiffs sought nearly 400,000 extension allowances for 1995 and 1996 and 180,000 bonus allowances for 1997 through 1999.

Plaintiffs were informed by the EPA on May 2, 1991, that it would take no action on the permit application because the filing was premature. Plaintiffs were advised that no requests for extensions or bonus allowances would be considered until the EPA had promulgated implementation regulations, which, under the statute, must be promulgated no later than May 15, 1992.

The proposed regulations which the EPA has published for comment propose a "telephone queuing" system for distributing the allowances. It is represented that those regulations will establish a date and time upon which the EPA will *begin* accepting applications for allowances from affected sources. Thus, it has become apparent, in the view of Defendant, that plaintiffs' March 1991 application does not place its extension proposal first in line for consideration. Despite having one of the very first completed submissions, plaintiffs, under the proposed regulations, will be compelled to compete in a lottery system with all other affected sources for the allocation of extension and bonus allowances. Plaintiffs maintain that this violates 42 U.S.C. § 7651c(d)(3) which requires the EPA to review and act upon extension proposals in order of receipt.

In their first claim for relief, plaintiffs assert that the Administrator has thus failed to perform a non-discretionary duty within the meaning of the Citizen Suit provisions of the Clean Air Act, 42 U.S.C. § 7604(a)(2). Plaintiffs seek an Order from the Court requiring the Administrator to review and take final action on its extension proposal. In the alternative, in their second claim for relief, Plaintiffs seek an Order requiring the Administrator to establish a "ranking" procedure which guarantees that proposals will be considered in order of receipt.

Plaintiffs amended their complaint on April 9, 1992, to include a third claim for relief, which maintains that the Defendant's failure to act represents "action unreasonably delayed" which, according to plaintiffs, provides the Court with jurisdiction to compel such action provided that notice is given to the EPA 180 days before the action is commenced. 42 U.S.C. § 7604(a).

The defendant contends that the Court lacks subject matter jurisdiction over the complaint, and that, even if the Court finds that it possesses jurisdiction, plaintiffs are not entitled to the issuance of a preliminary injunction. First, the defendant argues that the citizen suit provisions of the CAA are not available to the plaintiffs in this instance because a failure to perform a non-discretionary duty cannot be specifically identified. Briefly, it is argued that Title IV does not compel the Administrator to act by a date certain nor does he have a specific duty to process the permit applications and requests for extensions prior to promulgation of final regulations.

Moreover, the defendant argues that plaintiffs in this litigation are actually asserting a premature challenge to EPA's proposed rulemaking. As such, according

---

**6.** It is understood that this was either the first or second *completed* application to be received by the EPA.

to the defendant, the action must be brought only after final agency action, and exclusive jurisdiction would rest with the United States Court of Appeals for the District of Columbia.

On April 30, 1992, the defendant filed a motion to dismiss the amended complaint, claiming that plaintiffs' third claim for relief is barred because plaintiffs did not give the proper 180–day notice required by 42 U.S.C. § 7604(a). The defendant also argued that jurisdiction is improper in this Court and that the EPA has not unreasonably delayed action in this matter.

In reviewing the complex statutory provisions of Title IV, it is obvious that it is the intent of Congress to have the highest-emitting utility plants move rapidly and positively to reduce damaging environmental effects of sulfur dioxide emissions and to prevent the overburdening of consumers with a disproportionate share of the capital costs of environmental control. There is minimal appellate court guidance which is of benefit to the Court in resolving the issues raised and suggested in the instant litigation.

■ Plaintiffs have brought this suit under 42 U.S.C. § 7604(a)(2) and § 7604(a), alleging that the defendant failed to perform an act required by statute to be performed, that is, to review Phase I extension proposals in order of receipt, pursuant to 42 U.S.C. § 7651c(d)(3). The statute also mandates that such review be consistent with 42 U.S.C. § 7651g.

Section 7651g(c)(3) requires the Administrator to promulgate regulations to implement a federal permit program. The regulations were required to be promulgated by May 15, 1992. The owners and operators of Phase I affected sources, which are the highest-emitting utility plants in the nation, are required by this section of the statute to submit a permit application and compliance plan in accordance with those regulations by February 15, 1993. 42 U.S.C. § 7651g(c)(1)(A).

In the instant matter, the Administrator has failed to perform a non-discretionary function. The Court concludes that the Administrator's obligation to review exten-

sion proposals in order of receipt must be considered distinct from the permit regulations that he is mandated to promulgate under 42 U.S.C. § 7651g(c)(3).

The Administrator has failed to consider or even rank plaintiffs' extension proposal in order of receipt. Congress did not require EPA to promulgate regulations establishing a *federal permit* program until May 15, 1992. However, there is no statutory authority which suggests that Congress authorized the EPA to defer consideration of extension proposals until that time. Moreover, any attempt to defer action on extension proposals and any attempt to refuse acceptance of extension proposals to defeat the "in order of receipt" language is contrary to statutory language and the obvious Congressional intent to arrest the adverse effects of acidic deposition by providing affected sources with a program to alleviate the extraordinary costs associated with such a project.

The plaintiffs' enthusiastic efforts of compliance are in keeping with the statutory language as well as the incentives built into the statute by Congress. Congress entrusted the EPA with responsibility to administer the program, and the refusal to acknowledge extension proposals "in order of receipt" and the consequent delay in reviewing extension proposals, undermines and frustrates the overall Congressional goal to clean the environment by giving the industry incentives to do so.

■ The Court is not persuaded by the defendant's jurisdictional arguments. The Administrator has a non-discretionary duty to *review* extension proposals "in order of receipt." In this instance, not only has the Administrator failed to exercise this duty, but he has taken contrary affirmative action by rejecting the receipt of plaintiffs' extension proposal and by refusing to rank it in the order received. Under these circumstances, the Court has subject matter jurisdiction pursuant to 42 U.S.C. § 7604(a)(2), and Defendant's Motion to Dismiss must be denied.

■ In addition to establishing that subject matter jurisdiction exists, the Plaintiffs

have also established their entitlement to preliminary injunctive relief under the standards set forth in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977), and as re-affirmed recently in *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir.1991). It is well established in this Circuit that four factors must be considered:

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;

(2) the likelihood of harm to the defendant if the requested relief is granted;

(3) the likelihood that the plaintiff will succeed on the merits; and

(4) the public interest.

*Rum Creek*, 926 F.2d at 359, *quoting, L.J. v. Massinga*, 838 F.2d 118, 120 (4th Cir. 1988).

■ The irreparable harm to the plaintiff and the harm to the defendant are the two most important factors. *Rum Creek*, 926 F.2d at 359. In balancing these two factors in the instant case, the balance "tips decidedly" in favor of plaintiffs. The capital investment required to install scrubbers is enormous. Congress anticipated this and provided incentives for electric utilities in the form of extension and bonus allowances. These incentives are now being subverted by the EPA's rejection of extension proposals and by its refusal to acknowledge the submission of these proposals "in order of receipt." The uncertainty created by the EPA's action is affecting the financial viability of plaintiffs' efforts to comply with Title IV, and is unnecessarily subjecting ratepayers to costs which could be absorbed by the incentives provided by Congress. Bonus and extension allowances will be valueless and the importance of being given a two-year extension will be virtually meaningless unless the EPA is enjoined from refusing to rank extension proposals "in order of receipt." In addition, the harm being caused by the EPA cannot be remedied by damages, as sovereign immunity protects the defendant.

The likelihood of harm to the defendant, on the other hand, is slight. Although it anticipates an elaborate lottery system for distributing allowances, a preliminary injunction requiring it to acknowledge extension proposals "in order of receipt" will not instill the havoc foreseen by the defendant. This injunction does not affect the regulations establishing a federal permit program. Requiring the defendant to rank extension proposals "in order of receipt" does not interfere with the rulemaking governing the federal permit program. The integrity of the acid rain program is not harmed; rather, integrity and fairness in allocating the allowances is required by this injunction and is compelled by Congress' mandate that the extension proposals be reviewed "in order of receipt." This injunction merely enforces the rewards legislated by Congress to be given to affected sources which act swiftly in submitting extension proposals and in complying with Title IV.

■ Because the hardship balance appears to favor plaintiffs, they need only show "grave or serious" questions for litigation to satisfy *Blackwelder's* third prong, likelihood of success. The Court is satisfied that a serious question for litigation is present.

Finally, it is not difficult to ascertain and determine that the public interest rests on plaintiffs' side. The vital essence and overall purpose of Title IV is to reduce the adverse effects of acid rain by encouraging major polluters to reduce sulfur dioxide emissions and by providing incentives for high-sulfur coal sources to install scrubber technology for this purpose. It is in the public's best interest that this goal be accomplished expeditiously and efficiently and that extension proposals be acted upon forthwith in order that ratepayers be relieved of the major burden of the capital investment required to achieve compliance. By refusing to accept extension proposals and by failing to rank extension proposals in order of receipt, the defendant is creating an abundance of uncertainty, which will harm ratepayers and will economically devastate communities dependent upon high-sulfur coal production. This is a result that Congress sought to avoid by enacting

the incentive program outlined in 42 U.S.C. § 7651c(d). This Court is compelled to give primary deference to Congress' intent and is confident that this intent best serves the public interest. Accordingly; it is

ORDERED that Plaintiffs' Motion for Preliminary Injunction be, and the same is hereby, GRANTED and that Defendant's Motion to Dismiss Amended Complaint be, and the same is hereby, DENIED. It is further

ORDERED that the defendant is hereby enjoined to "rank" the extension proposal submitted by plaintiffs on or about March 19, 1991, in order of its receipt, and to appropriately rank and determine plaintiffs' entitlement to extension and bonus allowances from the 3.5 million allowance pool. It is further

ORDERED that the injunction is conditioned upon the execution of a bond, by an appropriate surety satisfactory to the Clerk of Court, in the amount of $10,000.