**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 06-1924**

HCI TECHNOLOGIES, INCORPORATED,

Plaintiff - Appellant,

versus

AVAYA, INCORPORATED,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, District Judge. (1:06-cv-00778-TSE)

Argued: May 22, 2007                    Decided: July 12, 2007

Before WILLIAMS, Chief Judge, GREGORY, Circuit Judge, and Benson E. LEGG, Chief United States District Judge for the District of Maryland, sitting by designation.

Affirmed by unpublished per curiam opinion.

Thomas M. Brownell, HOLLAND & KNIGHT, L.L.P., McLean, Virginia, for Appellant. Rodney F. Page, BRYAN & CAVE, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Brandon H. Elledge, HOLLAND & KNIGHT, L.L.P., McLean, Virginia; Matthew A. Clary, III, Fairfax, Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

HCI Technologies, Inc. ("HCI") appeals the district court's orders denying its motion for a temporary restraining order and preliminary injunction and dismissing its claims against Avaya, Inc. ("Avaya") pursuant to the mandatory arbitration agreement in the parties' contract. HCI argues that the district court misapplied the four-part test governing motions for injunctive relief by failing to recognize that each of the relevant considerations weighed in favor of HCI. HCI further contends that the district court erred in dismissing its claims in their entirety, because the contract did not require HCI to submit its requests for permanent injunctive relief to arbitration. For the reasons that follow, we affirm the district court's orders.

I.

A.

Avaya is a world-wide manufacturer and supplier of telecommunications systems, applications, and equipment, including a line of "Private Branch Exchanges" ("PBX"s)[1] and a line of IP Telephony, or "Voice over IP Systems," under a variety of names and trademarks. Avaya sells equipment directly and also through over 300 authorized sellers, known as "Business Partners." Measured by

---

[1]A PBX is a computer that switches and connects telephone calls within a facility.

revenue, Avaya and its Business Partners control approximately 20% of the U.S. market for new PBX and related equipment.

Avaya's telephony equipment requires service and periodic maintenance over its useful life. In the United States, service and maintenance of Avaya products is performed by Avaya itself, by many of its Business Partners, by independent service organizations (ISOs), and by customers themselves. Business Partners have the choice of providing their own maintenance services or reselling Avaya services in whole or in part to complement their capabilities. Avaya competes with its Business Partners to provide maintenance services to some PBX owners, and works in concert with its Business Partners to supply maintenance to others.

Proprietary software embedded in Avaya PBXs facilitates service and maintenance of the PBXs. Avaya, of course, has access to its own propriety software. Avaya also licenses the software to its Business Partners and to PBX owners. The software enables the licensee to identify and diagnose, and, in some cases, resolve, maintenance problems remotely. Licensees access Avaya's diagnostic/maintenance software through passwords called "login codes" or "logins." Business partners receive access to the software through logins called "DADMINs." PBX owners may purchase logins called "Maintenance Software Permissions" ("MSPs"), by entering into a "Maintenance Assist" contract. Diagnostic and

3

maintenance functions can be performed at the site of the equipment without the use of Avaya's proprietary software.

B.

HCI was an Avaya Business Partner until July 10, 2006, when Avaya terminated its contract with HCI. It is undisputed that HCI acted as Business Partner through a series of increasingly restrictive Master Reseller Agreements, entered into in 1999, 2003, and 2005. The parties dispute Avaya's motivation in conditioning its continued willingness to have HCI as a Business Partner on HCI's acceptance of more restrictive contractual terms. HCI asserts that Avaya made a corporate business decision to take back the service market from its Business Partners and used the new restrictions to undermine the Business Partners. Avaya contends that it insisted on additional protections after it came to believe that HCI was working with Verizon, Inc. to disrupt Avaya's relationships with its customers.

It is undisputed that HCI's contracts with Avaya allowed HCI to resell Avaya services only to end users and prohibited HCI from serving as a subcontractor by reselling Avaya services to other resellers. Nevertheless, HCI did obtain authorization from Avaya to sell Avaya products to AT&T solely for the benefit of a single end user; this authorization was memorialized in an addendum to HCI's contract with Avaya. And in 2002, Avaya allowed HCI to enter into a teaming relationship with Verizon.

4

After Avaya came to believe that a goal of the HCI/Verizon relationship was to interfere with Avaya's business, however, Avaya began to reevaluate its relationship with HCI. In September 2003, Avaya sent HCI a letter indicating that it did not intend to renew its 2003 contract with HCI for another year.[2] It is undisputed that "Avaya . . . relent[ed] only when HCI entered into a New Master Reseller Agreement of Business Partner Program . . . on December 20, 2005," which superseded the parties' prior Agreement. (J.A. at 8.)[3] The December 2005 Agreement provided that either party could terminate the contract "at any time without cause by giving the other party twenty-four (24) hours written notice of the termination." (J.A. at 179.)

In February 2006, Avaya and Verizon each submitted a bid for an equipment and services contract with Washington Mutual. Verizon's bid indicated that HCI would act as a subcontractor to provide support services for Avaya communications products. Ultimately, Washington Mutual accepted Verizon's bid. Avaya believed that HCI violated its Master Reseller Agreement by teaming

---

[2]Avaya's September 23, 2003 Agreement with HCI superseded the first agreement between the parties. The September 23, 2003 Agreement had a term of one year and automatically renewed each year unless either party provided notice of its intent not to renew the Agreement 60 days prior to September 23 of that year. The September 23, 2003 Agreement also provided that either party could terminate the Agreement without cause by giving the other party 60 days written notice of termination.

[3]Citations to the "J.A." refer to the contents of the joint appendix filed by the parties in this appeal.

with Verizon to win the Washington Mutual contract. Accordingly, on May 16, 2006, Avaya sent HCI a notice of termination. The notice of termination incorrectly relied on the 60 day notice provision of the parties' 2003 Agreement.

C.

Fifty-one days after receiving Avaya's notice of termination, on July 5, 2006, HCI filed a Verified Complaint to Enjoin Threatened Termination of Business Partner/Dealer Contract in the United States District Court for the Eastern District of Virginia. The complaint alleged, among other things, that Avaya's notice of termination was defective because it relied upon and purported to terminate the superseded 2003 Agreement. This prompted Avaya to send, on July 10, 2006, a new, twenty-four hour notice of termination in compliance with the December 2005 Agreement, terminating HCI as of July 11, 2006.

HCI's complaint named Avaya and Catalyst Telecom, Inc. (one of two authorized dealers of Avaya hardware in the United States) as defendants.[4] The complaint stated nine causes of action: two Sherman Act claims, a claim of race discrimination under 42 U.S.C. § 1981, and six pendant Virginia state law claims (which included a claim for violations of the Virginia Equipment Dealers Protection Act, two tortious interference with contract claims, and claims for

_____

[4]On August 3, 2006, HCI filed a Notice of Dismissal voluntarily dismissing its claims against Catalyst Telecom. Catalyst Telecom is not a party to this appeal.

breach of contract, conspiracy to injure in trade or business, and promissory estoppel).

On July 6, 2006, HCI filed an Emergency Motion for Temporary Restraining Order and for Preliminary Injunction. In its motion, HCI alleged that it would be irreparably harmed if Avaya terminated HCI's Business Partner status and denied HCI access to logins, spare parts, and the support necessary for HCI to service its customers' Avaya PBXs. HCI also alleged that sales of Avaya equipment constituted 30% of its business, and maintenance and support of Avaya equipment constituted another 40% of its business.

On July 12, 2006, the district court held a hearing addressing the motion for a temporary restraining order (TRO), but instructed HCI that, pursuant to Federal Rule of Civil Procedure 65, it could not issue a preliminary injunction. See Fed. R. Civ. P. 65(a)(1) ("No preliminary injunction shall be issued without notice to the adverse party."). The district court then entered an order denying HCI's motion for a TRO and preliminary injunction and dismissing HCI's § 1981 and state law claims pursuant to the parties' arbitration agreement.[5] The district court requested supplemental briefing on the arbitrability of the antitrust claims. Upon

_____

[5]The parties' December 2005 Agreement provides that "all Disputes must be finally resolved by binding arbitration," but also contains a provision stating that "[e]ither party may, at its sole discretion and at any time during the dispute resolution process, seek injunctive relief in any court of competent jurisdiction (including but not limited to preliminary injunctive relief)." (J.A. at 179.)

7

completion of the supplemental briefing, the district court entered an order dismissing the two Sherman Act claims as well.

HCI timely appealed the district court's orders. We have jurisdiction pursuant to 28 U.S.C.A. § 1292(a)(1) (West 2006) (providing for appellate jurisdiction to review the district courts' denial of injunctions) and 28 U.S.C.A. § 1291 (West 2006) (providing for appellate jurisdiction over final decisions of the district courts).

## II.

We review the grant or denial of a preliminary injunction for abuse of discretion. Safety-Kleen, Inc. (Pinewood) v. Wyche, 274 F.3d 846, 859 (4th Cir. 2001). We review the district court's findings of fact for clear error, and we review its legal conclusions de novo. Id.

Before turning to the merits of HCI's appeal, we must determine whether there remains a "live" controversy before us. "'[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" Kennedy v. Block, 784 F.2d 1220, 1222 (4th Cir. 1986) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)).[6] And, "when a case has become moot after the entry of the district court's judgment,

---

[6]The district court did not address the issue of mootness, although Avaya terminated the Agreement the day before the motions hearing.

an appellate court no longer has jurisdiction to entertain the appeal." Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir. 2003).

Avaya argues that HCI's appeal is moot, because the action sought to be prevented, the termination of the parties' December 2005 Agreement, has already occurred. It is well established that "[a]n appeal of the denial of an injunction to prohibit an act is rendered moot by the happening of the act." Ry. Labor Executives Ass'n v. Chesapeake W. Ry., 915 F.2d 116, 118 (4th Cir. 1990). Accordingly, at oral argument, HCI conceded that its appeal is "probably moot" to the extent that it challenges the termination of the parties' December 2005 Agreement. Nevertheless, HCI contends that its entire appeal is not moot because the relief it requested from the district court is far broader than an injunction against the termination of its reseller agreement with Avaya -- HCI also sought continued access to spare parts, logins, and Avaya technical support. Because HCI continues to service Avaya equipment and Avaya has not yet terminated HCI's access to parts and logins, not all of the actions sought to be enjoined have already occurred.

We agree with HCI that this appeal is not entirely moot. In its motion for a TRO and preliminary injunction, HCI alleged that it would suffer irreparable harm if "Avaya is not enjoined from Terminating HCI's Master Reseller Agreement and if Avaya and Catalyst Telecom are not barred from denying HCI access to Avaya equipment and needed passwords, logins, and replacement part[s] to

9

service equipment for HCI customers." (J.A. at 56.) Thus, HCI sought to prohibit Avaya from taking other actions in addition to terminating its contractual relationship with HCI. HCI asserts that it continues to service Avaya equipment despite the termination of the December 2005 Agreement, but it would be unable to do so if Avaya terminated its access to parts and logins. Moreover, Avaya concedes that although the contractual relationship is at an end, as a practical matter, its relationship with HCI cannot be dismantled overnight. Avaya disclaims any intent "to have this be an abrupt termination of service" to HCI's customers. (J.A. at 300.)

Thus, not all of the actions HCI sought to enjoin have already occurred, and, as a result, the appeal is not entirely moot. It is, however, moot to the extent that HCI challenges the termination of the December 2005 Agreement. See Ry. Labor Executives Ass'n, 915 F.2d at 118 (holding that a union's appeal from the denial of an injunction against a defendant's "entire policy" of transferring railway lines without bargaining was not entirely moot, but was moot with regard to any transaction that had already been completed by the time of the appeal).

## III.

We now turn to the merits of HCI's appeal. HCI contends that the district court erred by (1) denying its motion for a TRO and

10

preliminary injunction, and (2) dismissing its claims in their entirety rather than severing HCI's request for permanent injunctive relief from its otherwise arbitrable claims and retaining jurisdiction over the resulting "injunction case." We address each argument in turn.

A.

The grant of a preliminary injunction rests in the discretion of the district court, which is exercised through the balancing of factors set out in the four-part test in Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977), and its progeny. Under this test, a court should consider (1) the likelihood of irreparable harm to the plaintiff if a preliminary injunction is denied, (2) the likelihood of harm to the defendant if a preliminary injunction is granted, (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 526 (4th Cir. 2003); see also Blackwelder, 550 F.2d at 196. "[T]he plaintiff bears the burden of establishing that each of these factors supports granting the injunction." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991) (internal quotation marks and alteration omitted).

In applying the Blackwelder test, "[t]he irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." Rum Creek Coal Sales, Inc. v. Caperton, 926

11

F.2d 353 (4th Cir. 1991).  If the balance of those two factors "tips decidedly in favor of the plaintiff, . . . a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation."  Id. (internal quotation marks and citation omitted).  As the balance tips away from the plaintiff, however, "a stronger showing on the merits is required."  Id.

With regard to the potential for irreparable harm to HCI, the district court found that HCI remained free to sell and service Avaya products, albeit on less favorable terms than it enjoyed as a Business Partner, and could also pursue strategic alternatives such as expanding its sales and service of PBXs made by manufacturers other than Avaya.  As a result, HCI's allegations that it would be driven out of business were not persuasive to the district court, which concluded that HCI had failed to show that it would suffer irreparable harm in the absence of a TRO or preliminary injunction.  The district court also noted that even if HCI were driven out of business, "it [would] not necessarily follow that this would constitute irreparable harm," because the record suggested that HCI's damages could be quantified with precision. (J.A. at 327.)

On appeal, HCI challenges the district court's conclusion that HCI is unlikely to be driven out of business by reasserting that it

12

will "suffer, directly or indirectly, the loss of 95% of its business" and will "possibly be unable to continue in business." (Appellant's Br. at 16.) HCI does not, however, offer any evidence to support this allegation. HCI offers no basis on which we could conclude that the district court's finding -- that because HCI remains free to sell and service PBXs made by Avaya and other manufacturers, it is unlikely to suffer the devastating loss of income it alleges -- is clearly erroneous. To the contrary, HCI, in arguing that its appeal is not moot, admits that it has retained its customer base and continues to serve customers that own Avaya equipment. And Avaya, for its part, has claimed to have no interest in abruptly terminating HCI's service to its existing customers. Nothing in the record indicates that Avaya's position in this respect has changed. We therefore conclude that the district court did not err in finding that HCI failed to show irreparable harm.[7]

The district court was required to "consider each [Blackwelder] factor in ruling on [HCI's] motion for preliminary injunction." Berry v. Bean, 796 F.2d 713, 716 (4th Cir. 1986). Accordingly, it proceeded to analyze whether, despite HCI's failure to demonstrate a probability that it would suffer irreparable harm,

---

[7]HCI also contests the district court's alternative conclusion that, in HCI's case, being put out of business would not necessarily constitute irreparable harm. We need not address this issue, however, because HCI's failure to show that it would be put out of business renders the question academic.

the balance of the factors might nevertheless weigh in favor of issuing an injunction.  See Dan River, Inc. v. Icahn, 701 F.2d 278, 283 (4th Cir. 1983) (stating that "[i]f the likelihood of success is great, the need for showing the probability of irreparable harm is less" (internal quotation marks omitted)).

With regard to HCI's antitrust claims, the district court concluded that HCI had "not presented even a 'serious question' on the merits, to say nothing of a likelihood of success."  (J.A. at 329.)  The district court's analysis and HCI's arguments on appeal focus primarily on HCI's "tying" claim under Section 1 of the Sherman Act.  To establish this type of claim, a plaintiff must show (1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce.  (J.A. at 328 (citing Service & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 683 (4th Cir. 1992).)  HCI's tying claim alleged that Avaya conditioned the right to buy the "equipment, parts and software" it produced upon the purchase of service contracts from Avaya.  (J.A. at 51, 15.)  The district court concluded that HCI's tying claim was unlikely to prevail because there was "no merit in HCI's contention that Avaya

14

has market power because it has 100% of the market as defined by sale of its own products," and "a more correct relevant market would be the market for all PBX products," not just those produced by Avaya. (J.A. at 328.) Because Avaya has only 20% of the overall PBX market, the district court found it unlikely that HCI could show Avaya had the requisite market power necessary to sustain its claim. The district court also noted that the tying claim was unlikely to succeed in light of evidence in the record suggesting that companies other than Avaya provide 76% of maintenance services on Avaya equipment in the United States.[8]

On appeal, HCI disputes the district court's conclusions concerning its likelihood of success on its antitrust claims, but does not make any arguments regarding its § 1981 and state law claims. HCI relies almost entirely on Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451 (1992). Essentially, HCI contends that Kodak stands for the proposition that there can exist two separate markets, one for spare parts made by a single

---

[8]The district court also found that HCI was unlikely to prevail on its other claims. It noted that HCI had presented virtually no evidence to support its § 1981 claim and that HCI had based its state law claims on Virginia law despite a choice of law provision in the parties' contract specifying that New Jersey law governs the parties' disputes. Aside from suing under the law of the wrong state, the district court reasoned that HCI would face significant hurdles in asserting a claim under the Virginia Equipment Dealer Protection Act, which only covers farm equipment, and in pursuing contract/promissory estoppel claims based on Avaya's decision to exercise its contractual right to terminate the December 2005 Agreement on 24-hours notice.

manufacturer, and another for the service of that manufacturer's equipment, and it is possible to assert antitrust claims alleging that the manufacturer illegally tied those two markets together or monopolized the service market.

Avaya argues that we need not address HCI's likelihood of success in establishing a relevant market, because HCI has not suffered an antitrust injury and therefore lacks antitrust standing.  Congress "did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  Associated Gen. Contractors v. California State Council of Carpenters, 459 U.S. 519, 534 (1983) (internal quotation marks and citation omitted).  For a plaintiff to have standing to bring suit under the antitrust laws, a plaintiff must, among other things, have suffered an "antitrust injury," that is, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); see also Deiter v. Microsoft Corp., 436 F.3d 461, 467 (4th Cir. 2006) (stating that an antitrust injury is an element of an antitrust plaintiff's prima facie case).  As the district court noted at the motions hearing, "antitrust protects competition, not competitors."  (J.A. at 317); see also Brunswick Corp., 429 U.S. at 488 (stating that "[t]he antitrust

16

laws . . . were enacted for the protection of <u>competition</u> not <u>competitors</u>" (internal quotation marks omitted)).[9]

We agree that HCI will likely prove unable to establish antitrust standing. HCI has offered no evidence to suggest that competition for the provision of service and maintenance of Avaya PBXs has decreased. Rather, HCI bases its claims on the possibility that the market may soon have one less competitor: HCI. We have previously recognized that "the elimination of a single competitor, standing alone, does not prove [the] anticompetitive effect" necessary to establish antitrust injury. <u>Military Servs. Realty, Inc. v. Realty Consultants of Virginia</u>, 823 F.2d 829, 832 (4th Cir. 1987). When pressed to identify other competitors who were in danger of being forced out of business by Avaya's allegedly anticompetitive activity, HCI has been unable to do so. Instead, HCI simply referenced the existence of <u>United Asset Coverage, Inc. v. Avaya, Inc.</u>, 409 F. Supp. 2d 1008 (N.D. Ill. 2006), a case Avaya cited in its appellate brief. That case, however, does not aid HCI in establishing an antitrust injury. The decision, which denied

---

[9]Although the district court did not make HCI's likely inability to establish antitrust standing an express basis of its ruling, it expressed skepticism at the motions hearing that HCI had demonstrated the existence of "a practice . . . that is injurious to competition." (J.A. at 317.) In its written opinion, the district court described HCI's suit as essentially a breach of contract dispute in which HCI, having chosen to "bite the proverbial hand that fed it" by pursuing teaming arrangements to Avaya's detriment, was not entitled to enjoin Avaya from exercising its contractual right to terminate its Agreement with HCI. (J.A. at 331.)

United Asset Coverage ("UAC")'s motion for a preliminary injunction, stated that UAC "d[id] not itself provide maintenance for Avaya PBXs," and had offered "no evidence" that the number of service providers competing with Avaya to provide maintenance services had decreased. Id. at 1044.[10]

Moreover, the record evidence indicating that 76% percent of maintenance services on Avaya equipment are not performed by Avaya undermines HCI's contention that Avaya has unlawfully inhibited competition among service providers. In fact, HCI conceded in its complaint that Avaya "lacks power in the market for installation, maintenance and support services for its equipment," and alleged that Avaya frequently came in second to HCI and its teaming partners in competition due to HCI's superior reputation for service, lower overhead, and status as a minority contractor. (J.A. at 15.) HCI simply cannot turn Avaya's termination of its Reseller Agreement into an antitrust violation. Accordingly,

_____

[10]At oral argument, HCI's counsel also claimed that there were "other cases . . . pending around the country with several other Business Partners who got into the bad graces of Avaya for reasons similar to [HCI]'s" and claimed to have seen documents indicating that the number of Avaya Business Partners has decreased from approximately 1500 to roughly 300. HCI did not, however, provide any supporting documentation to the court. And vague allusions to other Business Partners falling into Avaya's "bad graces" are not probative of an injury to competition caused by an attempt to restrain trade. To the contrary, they suggest, if anything, that the Business Partners Avaya terminated did not fall victim to a generalized scheme to eliminate competition, but rather took some action that prompted Avaya to reconsider its relationship with those particular resellers.

18

because HCI is unlikely to establish antitrust standing, we agree that HCI has not raised a serious question, let alone demonstrated a likelihood of success, on the merits of its antitrust claims.

HCI also contends that the district court gave too little weight to two factors -- the public interest and the harm to Avaya -- in concluding that HCI was not entitled to an injunction. HCI argues that the public interest would be served by a grant of temporary injunctive relief, because HCI provides services to government customers, including the Department of Homeland Security (DHS) and the White House, and the public has a strong interest in ensuring that these customers' phone service continues uninterrupted. The district court did not explicitly address this contention, but implicitly rejected HCI's argument by finding that HCI could continue to service its customers' Avaya PBXs, albeit on less favorable terms. As discussed above, HCI continues to provide maintenance services to its existing customers, and Avaya has no interest in causing an abrupt termination of service to these customers. Thus, HCI has failed to establish that the public interest would be served by an injunction.

According to HCI, an injunction is nevertheless warranted, because it is clear that Avaya will suffer no harm at all if a TRO or preliminary injunction is granted. This claim is also unfounded. First, HCI cites no authority that would support the conclusion that a district court abuses its discretion by denying

19

an injunction to a plaintiff that has not shown that it faces irreparable harm, that it is likely to succeed on the merits, or that the public interest would be served if the requested relief were granted simply because the defendant faces little or no harm. Second, HCI has admittedly used its status as an Avaya Business Partner to act as a subcontractor by reselling Avaya services to other resellers, a practice that Avaya considers subversive to its business model and that is therefore prohibited by the parties' contract. Accordingly, Avaya faces harm from the imposition of an injunction, as a grant of injunctive relief would effectively force Avaya to continue to deal with a reseller that refuses to comply with Avaya's business model, but without the protections contained in the terminated Reseller Agreement. Cf. Roland Machinery Co. v. Dresser Indus., Inc., 749 F.2d 380, 392 (7th Cir. 1984) (concluding that forcing a manufacturer who had entered into a contract that was of short duration and subject to short cancellation notice as a means of protecting its right to "use its own judgment with respect to those whom it wishes to appoint as its dealers" would endure a "great hardship" if forced to continue for an indefinite number of years a relationship with a dealer with whom it no longer wished to be associated).

B.

We now turn to HCI's argument that the district court erred in dismissing its claims in their entirety, because the parties'

20

December 2005 Agreement excludes claims for injunctive relief from the Agreement's mandatory arbitration clause. The Agreement provides that "all Disputes must be finally resolved by binding arbitration," but also contains a provision stating that "[e]ither party may, at its sole discretion and at any time during the dispute resolution process, seek injunctive relief in any court of competent jurisdiction (including but not limited to preliminary injunctive relief)." (J.A. at 179.) HCI interprets this language to allow its "injunction case" to remain before the district court. HCI thus contends that the district court should have severed its requests for permanent injunctive relief from the otherwise arbitrable claims and either proceeded on the merits or stayed the "injunction case" pending arbitration.[11]

Because HCI did not make this argument before the district court, it is waived. See Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993) (stating that "issues raised for the first time on appeal generally will not be considered" and "exceptions to this general rule are made only in very limited circumstances, such as where refusal to consider the newly raised issue would be plain

---

[11]HCI uses the term "claim" in reference to the relief requested on each cause of action, not the cause of action itself. HCI included permanent injunctive relief among the remedies requested on every count included in its complaint; it is not arguing that the district court could properly dismiss some counts but not others. Rather, HCI contends that the district court was required to sever each cause of action according to the relief requested and conduct a parallel proceeding on HCI's "injunction case" while the arbitrator determined HCI's entitlement to damages.

21

error or would result in a fundamental miscarriage of justice").

HCI had ample opportunity to raise this issue after the district court dismissed seven of its claims and requested supplemental briefing on the arbitrability of its antitrust claims. In inviting the parties to file supplemental briefs, the district court made clear that the issue to be addressed was "whether the parties' obligation to go to arbitration . . . includes the federal antitrust claims." (J.A. at 319.) HCI argued only that the antitrust claims were not arbitrable as a matter of law (a contention it does not reassert on appeal). It never asserted that its obligation to arbitrate the dispute did not apply to the extent that HCI sought injunctive relief as a remedy to an otherwise arbitrable claim. Accordingly, there is no reason to abandon the general rule barring consideration of issues raised for the first time on appeal.[12]

---

[12]We note that HCI argues only that it is not required to arbitrate its "injunction case," not that injunctive relief would be unavailable in arbitration. We have previously noted that "[a]rbitrators enjoy broad equitable powers" and "may grant whatever remedy is necessary to right the wrongs within their jurisdiction." Gilmer v. Interstate/Johnson Lane Corp., 895 F.2d 195, 199 (4th Cir. 1990), aff'd, 500 U.S. 20 (1991). Although the December 2005 Agreement limits the arbitrator's authority to award damages, it does not restrict the arbitrator's ability to grant injunctive relief if necessary.

In sum, we conclude that the district court did not abuse its discretion in denying HCI's motion for a TRO and preliminary injunction.  We also conclude that HCI has waived its argument that the district should have severed its request for permanent injunctive relief from its otherwise arbitrable claims and allowed the resulting "injunction case" to proceed before the court.  We therefore affirm the district court's orders denying HCI's motion for a TRO and preliminary injunction and dismissing HCI's claims pursuant to the parties' arbitration agreement.

AFFIRMED